**BROTHERHOOD OF RAILROAD SIGNALMEN, Plaintiff-Appellant,**

**v.**

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant-Appellee.**

**No. 86–2602.**

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1987.

Decided Sept. 15, 1987.

Thomas P. Murphy, Highsaw & Mahoney, P.C., Washington, D.C., for plaintiff-appellant.

T. Jay Thompson, Burlington Northern R.R., Ft. Worth, Tex., for defendant-appellee.

Before CUMMINGS, CUDAHY and POSNER, Circuit Judges.

CUMMINGS, Circuit Judge.

The issue in this appeal is whether a request by a member of a railroad's security force that some employees voluntarily submit to polygraph examinations constitutes a major dispute within the meaning of the Railway Labor Act. See generally *Leu v. Norfolk & Western Railway*, 820 F.2d 825 (7th Cir.1987). The district court held that on the facts of this case it did not. We affirm.

## I.

One safety device commonly used by railroads is known as a track relay, which when operating properly will automatically detect unsafe or occupied portions of railroad track. This information is conveyed to railroad crews through signals located near the railroad track. An important purpose of the track relay is to prevent accidents such as head-on collisions. The automatic safety feature of the track relay can be defeated, however, when it is "tipped." On approximately August 15, 1985, after a "false proceed signal" was reported on track operated by the Burlington Northern Railroad in Prairie du Chien, Wisconsin, an investigation by two railroad signalmen revealed that a track relay, which was inside a signal case, had been "tipped." The incident was reported to Burlington Northern supervisory personnel and to the local sheriff's office.

For a long period of time, Burlington Northern has used a team of private enforcement personnel, known as special agents, to protect railroad property and to gather facts to determine if work rules have been violated. Because of the seriousness of a "tipped" track relay, the special agents began an investigation to determine who was responsible for the "tipped" track relay. The agents interviewed a signalman who had been recently involuntarily transferred to Chicago from Prairie du Chien. He had been seen in the area on August 15 and it was believed that he had a motive to "tip" the track relay. The agents notified him that he was a suspect and requested him to take a lie detector test at the sheriff's office in Prairie du Chien. Before he consented, he requested that Burlington Northern compensate him for the time involved, which it eventually did.

When the signalman arrived at the sheriff's office, he was introduced to a private polygraph examiner, James Schleifer, who requested that he sign a typed form which stated in pertinent part "I ... do hereby request voluntarily, without duress, coercion, threats, promises or immunity to be examined by the Polygraph (lie detector) detection of deception technique." The signalman signed the form and was told by Schleifer that he did not have to take the polygraph examination. He decided to take it. After Schleifer informed him that he had "done okay," he was excused. Primarily because of the results of the exami-

nation, the agents no longer suspected the signalman.

The investigation continued through the efforts of special agent Ronald Just. Agent Just obtained, from the signal construction supervisor for the Prairie du Chien area, the names of the seven signalmen who were working in the vicinity on August 15, 1985. Just went to the worksite of the signalmen and individually interviewed the five signalmen who were at the jobsite. Just emphasized the seriousness of the matter and asked each signalman to submit to a polygraph examination. The manner in which he made the request is in some dispute but it appears that Just emphasized, at least to some of the signalmen, that the polygraph examination would exonerate the innocent parties. The remaining two signalmen were later contacted by phone at the jobsite. All of the signalmen agreed to take the examination.

The tests were administered at the sheriff's office by Schleifer, who was paid to conduct the tests by Burlington Northern. As with the earlier test, all of the signalmen signed the consent form and were informed by Schleifer that they had the right to refuse to take the examination. In six of the cases, the signalmen consented and took the polygraph examination. In the seventh case, the signalman became quite agitated while waiting in the lobby of the sheriff's office. He kicked over a table, stood on it, and shouted some obscenities. The signalman calmed down but became agitated again when sometime later he was requested to sign the consent form. He eventually did sign the form, but then threatened Just, who was present at the sheriff's office. The signalman was then told that he did not have to stay if he did not want to take the test. He insisted upon taking the test but was uncooperative with Schleifer. Finally, he was told that if he wanted to take the test he would have to cooperate and "[i]f not, go home." He submitted to the examination and admitted that he had "tipped" the relay. Further investigation revealed that the signalman had negligently, rather than intentionally, "tipped" the relay switch. He was disciplined with a thirty-day suspension.

## II.

The Railway Labor Act was passed by Congress to promote stability in labor-management relations in the railroad industry. *Leu v. Norfolk & Western Railway*, 820 F.2d 825, 827 (7th Cir.1987). Under the Act, labor-management disputes come in only two varieties, major or minor. Major disputes usually involve attempts to change the "rates of pay, rules, or working conditions in a way not contemplated by the collective-bargaining agreement." *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad*, 802 F.2d 1016, 1021 (8th Cir.1986). Minor disputes do not involve fundamental changes in labor-management relations but rather focus on whether a change is arguably comprehended within an already existing collective bargaining agreement. *Id.* at 1022. Strikes over minor disputes are impermissible. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). If the parties disagree "as to whether the existing contract permits the carrier's actions, the dispute is minor unless the carrier's claims of contractual justification are 'frivolous' or 'obviously insubstantial.'" *Atchison, Topeka & Santa Fe v. United Transportation Union*, 734 F.2d 317, 321 (7th Cir.1984) (quoting *Chicago & Northwestern Transportation Co. v. United Transportation Union*, 656 F.2d 274, 279 (7th Cir.1981)). Although the language used to express the standard for determining whether a dispute is minor varies among the circuits, all the formulations "are essentially the same in their result." *Burlington Northern*, 802 F.2d at 1022. All demonstrate the relatively light burden that the railroad must meet in order to show that its unilateral actions constitute a minor dispute. *Id.*

The distinction between major and minor disputes is important because it affects the extent to which the federal courts can become involved in a dispute. Federal courts have broad powers to intervene in some major disputes. For example, for cer-

tain periods they can enjoin attempts to make major changes unilaterally and can force the parties to engage in noncoercive means of dispute resolution such as negotiation, mediation, voluntary arbitration, and conciliation. *Id.* at 1021. The Railway Act, however, prohibits federal courts from becoming involved in minor disputes. *Leu,* 820 F.2d at 828. Minor disputes must be resolved through an arbitration process that is subject to very narrow judicial review. *Morin v. Consolidated Rail Corp.,* 810 F.2d 720, 722 (7th Cir.1987); see generally *Elmore v. Chicago & Illinois Midland Railway,* 782 F.2d 94 (7th Cir.1986) (describing arbitration process under Railway Act).

■ The agreement or contract for purposes of determining whether a dispute is minor not only includes the written collective-bargaining agreement itself but also encompasses "working relationships, customs, and practices which are understood to be the norm, but which are nowhere reduced to a formal contract term." *Burlington Northern,* 802 F.2d at 1022. The Supreme Court has described the informal agreements as "actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time" that the dispute arose. *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969).

There is no dispute that an accepted practice is the use by Burlington Northern of special agents to investigate violations of work and safety regulations. Over the years, the investigators have sought and received the cooperation of employees of several different unions. The special agents have also used fingerprint analysis, document analysis, tool-mark identification, and other investigative techniques. Although there is some evidence that polygraph examinations have been used by special agents in investigating members of other unions, there is no evidence that a polygraph examination has been performed on a member of the signalmen's union. In light of this background, the union makes two arguments to support its contention that this dispute is major. First, it con-

tends that the signalmen did not consent to the polygraph examinations and that compulsory polygraph examinations constitute a major dispute. Alternatively, it contends that even if the signalmen did voluntarily consent, there is still a major dispute because Burlington Northern had never previously requested a signalman to take a polygraph examination.

The union's first argument is without merit. Each signalman voluntarily showed up at the sheriff's office for the polygraph examination and was informed by the examiner that he did not have to consent to the examination. All voluntarily executed the consent forms. The union cites no evidence to indicate that any of the signalmen were threatened with any form of retaliation from Burlington Northern if they declined to take the examination. This is an important factor because a threat of retaliation by the railroad would vitiate the consent. The most coercive statement the union cites in support of its argument is the statement made to the "agitated" signalman that if he wanted to take the examination he would be required to cooperate with the examiner. However, he was also told that if he did not want to take the examination, he should go home. Far from indicating a coercive atmosphere, the statements indicate voluntariness because that signalman was explicitly told that he could go home if he did not want to take the examination. We conclude that the evidence supports the district court's holding that all of the signalmen consented to the examinations.

■ The union also contends that the dispute here is actually major because this was the first time a special agent had ever requested a signalman to consent to a polygraph examination. We agree that the request for a polygraph examination does make this case somewhat different from the prevailing practice of requesting signalmen to cooperate in special agents' investigations. However, a major dispute is not created simply because a special agent in one particular investigation requested signalmen to submit to polygraph examinations. We agree with the Eighth Circuit's

recent observation that a minor change in the type of investigative technique used does not turn a minor dispute into a major one, *Burlington Northern*, 802 F.2d at 1022, at least when the investigative technique is used only with the consent of the employees involved.

We also reject the union's final argument that Burlington Northern improperly engaged in "direct dealing" with members of the union over working conditions. The union cannot point to what working condition is involved here. Because there was no coercion, we cannot accept the argument that an actual working condition is involved. Consenting to the polygraph examination was not a condition of employment. To the extent that the union challenges the right of Burlington Northern to request that union members cooperate in investigations, the prevailing practice between the union and Burlington Northern had been to allow Burlington Northern to request assistance and to allow the employees to cooperate. The slight variation of investigative technique involved here can only be considered a minor dispute.

### III.

It is important to emphasize what we are not deciding in this case. We are not deciding, as the Eighth Circuit recently did, that mandatory drug testing under certain specified conditions constitutes a minor dispute. *Burlington Northern*, 802 F.2d at 1023. We also are not deciding that the "addition of a drug screen to [a] routine urinalysis phase of an established medical examination program is a minor dispute." *Id.* at 1024. Finally, we are not even deciding whether a system-wide decision by Burlington Northern to request, but not compel, employees to take polygraph examinations constitutes a minor dispute. All of these issues can be left for another day. We merely hold that when one special agent investigating one specific incident requests and receives, without any threat of retaliation, the permission of signalmen to administer polygraph examinations, the dispute about whether the railroad acted properly is a minor dispute within the meaning of

the Railway Labor Act. Accordingly, we agree with the district court that it did not have jurisdiction over this dispute.

AFFIRMED.

CUDAHY, Circuit Judge, concurring:

Although I agree with the result and much of the majority's analysis, I cannot agree, for example, with the proposition that the use of a lie detector is only a "slight variation of investigative technique...." *Supra* p. 621. I also question the majority's implication that asking employees to submit to polygraph tests never involves a change in "working conditions" under the Railway Labor Act. A "working condition" is not necessarily limited to a requirement with which an employee must comply to avoid being fired.

In addition, I believe labor-management relations must always be viewed realistically. The employment relationship frequently involves coercion—spoken and unspoken. "Consent" by an employee to an investigative technique is therefore a tricky business. Here, the district court found that the consent of the employees made the testing voluntary and this finding is not clearly erroneous. We need not embellish this conclusion with much independent speculation.

Beyond this, the polygraph examinations conducted here took place in a sheriff's office in the course of what started as a criminal investigation. This circumstance distinguishes the present facts from tests independently undertaken by the railroad and unrelated to law enforcement.