**CHICAGO AND NORTH WESTERN TRANSPORTATION CO., FRVR Corporation, and Interstate Commerce Commission, Plaintiffs–Appellees,**

v.

**RAILWAY LABOR EXECUTIVES ASSOCIATION, et al., Defendants–Appellants.**

**No. 88–1504.**

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1988.

Decided Aug. 23, 1988.

Ralph J. Moore, Jr., Shea & Gardner, Washington, D.C., for defendants-appellants.

Mark S. Raffman, I.C.C., Washington, D.C., Stephen M. Olson, Kirkpatrick & Lockhart, Pittsburgh, Pa., for plaintiffs-appellees.

Before WOOD, Jr. and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Appellant Railway Labor Executives Association ("RLEA") appeals from the district court's order granting a preliminary injunction to appellee Chicago & North Western Transportation Company ("C & NW") barring a strike by RLEA's constituent unions and denying RLEA's motion for a preliminary injunction barring the sale of C & NW's Duck Creek South line. We have jurisdiction over this matter pursuant to 28 U.S.C. § 1292(a)(1).

I

C & NW is a Class I rail carrier with operations in ten midwestern states. At present C & NW has approximately 9,000 employees. It is a party to eleven collective bargaining agreements with some fourteen unions representing its employees. Those unions are represented in this action by the RLEA. In the past twenty years C & NW has substantially reduced the size of its rail system by abandoning or selling unprofitable segments of track.

Since 1981, its work force has been significantly reduced, including the elimination of a large number of craft jobs covered by the eleven collective bargaining agreements.

In 1987 C & NW decided to sell a portion of its system known as the Duck Creek South line to FRVR Corporation ("FRVR"). FRVR is a new corporation and is not a Class I rail carrier. That fact and the "short line" nature of the Duck Creek South line, brought the proposed sale within the reach of the expedited procedure for securing prompt Interstate Commerce Commission ("ICC") approval of certain regional and short-line railroad sales articulated in the Commission's decision in *Ex Parte No. 392*, 1 ICC2d 810 (1985), *aff'd sub nom. Illinois Commerce Comm'n v. ICC*, 817 F.2d 145 (D.C.Cir.1987).[1] The proposed sale would result in the abolishment of more than 300 craft jobs on the C & NW. The majority of the craft employees whose jobs on the Duck Creek South line would be eliminated (some 200) would be hired by FRVR. C & NW anticipates that the balance of the affected employees will be able to find positions in the remainder of its system.

On December 23, 1987 C & NW and FRVR filed a Verified Notice of Exemption and Petition for Clarification with the ICC with regard to the Duck Creek South line sale. Under the procedures established in *Ex Parte No. 392*, the Commission's authorization of the sale became effective on December 30, 1987. In December 1987 C &

1. It is not necessary for the purposes of our analysis to fully recapitulate the course of events that lead the ICC to formulate the policy set forth in *Ex Parte No. 392*. It is sufficient to note that the new policy has its genesis in the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, and to briefly explain its primary features. The Staggers Act authorized the ICC to exempt from regulation a broad range of rail-related transactions deemed to be of limited scope. 49 U.S.C. § 10505(a). Acting pursuant to that statutory authorization, the Commission has developed a policy whereby a short-line rail sale to a non-carrier (like FRVR) is automatically approved within seven days of the filing of an application with the ICC for exemption from regulation under the Interstate Commerce Act, unless the Commission disapproves the application for exemption. 49 CFR 1150.32(b). In *Ex*

*Parte No. 392* the ICC announced its intention to exempt "substantially all" sales of rail lines to non-carriers from regulation under § 10901 procedures. 1 ICC2d at 816. One of the key ramifications of the ICC's new policy with regard to the approval of regional and short-line sales is the fact that the Commission no longer routinely imposes "labor protective conditions" on such sales. *Id.* at 815. These labor protective conditions, formerly imposed by the ICC as a routine part of its approval of a rail line sale, resulted in substantial pay and benefits protections being extended to the employees whose jobs were affected by such sales. In large part, the present dispute between C & NW and the RLEA member unions arises from the unions' efforts to negotiate pay, economic and other benefits to replace the protections formerly imposed by the ICC.

NW had informed the RLEA-represented unions of its intention to sell the Duck Creek South line. It did not serve notice on the unions under § 6 of the Railway Labor Act ("RLA" or the "Act"), 45 U.S.C. § 156, of an intent to change rates of pay, rules or working conditions. However, it did make one or more proposals to the unions pertaining to the payment of separation allowances to employees whose employment with C & NW would be terminated by the sale.

Upon learning of the planned sale of the Duck Creek South line, as early as October 1987, the several unions filed § 6 notices with C & NW seeking to negotiate an agreement covering the employees whose jobs would be affected. In February 1988 the unions served new § 6 notices on C & NW expressing their desire to negotiate severance notice requirements and wage, benefit and seniority protections for the craft employees who would be displaced by the sale of the Duck Creek South line. C & NW has refused to enter into negotiations with the unions under the RLA § 6 procedures.

On January 19, 1988 C & NW filed the present action under 28 U.S.C. § 2201 seeking a declaratory judgment that the proposed sale of the Duck Creek South line to FRVR and any labor protective provisions that might accompany it are subject to the exclusive jurisdiction of the ICC and therefore are not a proper subject of bargaining under the Railway Labor Act, 45 U.S.C. §§ 151–188 (1948). On February 22, 1988, FRVR's motion to intervene as a plaintiff was granted by the district court. On March 3, 1988, the ICC's motion to intervene as a plaintiff was granted.

Sometime in February 1988, C & NW informed the unions that the Duck Creek South line sale would be consummated on March 4, 1988. In response, the unions informed C & NW of their intent to strike if the sale went through without either an agreement being reached on the notice and other rights that would be afforded the employees displaced by the sale, or alternatively, an exhaustion of the RLA § 6 procedures. In response, on February 24, 1988,

C & NW filed in the district court a motion for a temporary restraining order and a preliminary injunction to prevent the unions from striking. RLEA filed cross-motions to enjoin the sale and in opposition to the temporary restraining order and preliminary injunction sought by C & NW. Pending resolution of this matter by the district court, C & NW agreed not to complete the Duck Creek South line sale and the unions agreed not to strike.

C & NW's motion and RLEA's cross-motion came before the district court for hearing on March 16, 1988. At the close of that hearing the district court announced its decision. The court refused to enjoin the Duck Creek South line sale, holding that it was without jurisdiction to do so because RLEA's effort to procure that injunction constituted an impermissible collateral attack on an ICC order. In so holding, the district court expressed its disagreement with the decision to the opposite effect of the U.S. Court of Appeals for the Third Circuit in *RLEA v. Pittsburgh & Lake Erie Railroad Co.*, 845 F.2d 420, 437–39 (3d Cir.1988) (holding, *inter alia*, that an effort by RLEA to obtain an injunction to prohibit a railroad from selling its rail assets pending bargaining over the effects of the sale on employees under the § 6 dispute resolution procedures of the RLA did not constitute an impermissible collateral attack on the ICC's decision to permit the sale under its *Ex Parte No. 392* procedure).

The district court granted C & NW's motion for a preliminary injunction against the threatened strike. The district court based this second holding on its interpretation of the RLA. Applying and interpreting relevant precedent from our Circuit, the district court determined the dispute between the RLEA and C & NW to be a "minor dispute" under the RLA dispute resolution framework and therefore subject to the exclusive jurisdiction of the National Railroad Adjustment Board ("NRAB"). Finally, the district court refused to condition the preliminary injunction barring any strikes on a delay in the Duck Creek South line sale.

The district court ordered C & NW and the RLEA to proceed with the resolution of their dispute before the NRAB pursuant to the § 3 RLA procedures. 45 U.S.C. § 153. On March 24, 1988 our Court agreed to hear the RLEA's appeal on an expedited basis. C & NW and FRVR agreed to delay consummation of the Duck Creek South line sale pending the decision of the present appeal.

## II

On this appeal we are asked to review the decision of the district court to grant a preliminary injunction barring a threatened strike by the several craft unions represented by the RLEA and the district court's concomitant decision to deny RLEA's request that it enjoin the Duck Creek South line sale. The district court's decision and the contentions of the parties focus upon the effect in this dispute of the RLA and the provisions of the Interstate Commerce Act pertaining to railroad carriers, 49 U.S.C. §§ 1 et seq. Our review of the district court's determinations of these questions of law is *de novo*. *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988). *See also United States v. L'Allier*, 838 F.2d 234, 240 (7th Cir.1988) (holding that a district court's determination of a question of law is reviewed *de novo* ). We will address first the issues pertaining to the Railway Labor Act.

## III

### A. The Relevant RLA Case Law

The Railway Labor Act was enacted by Congress to promote stability in labor-management relations in the railroad industry by providing, *inter alia*, procedures designed to facilitate the orderly and peaceful resolution of labor-management disputes. *Brotherhood of Railroad Signalmen v. Burlington Northern Railroad Co.*, 829 F.2d 617, 619 (7th Cir.1987) (citing *Leu v. Norfolk & Western Railway*, 820 F.2d 825, 827 (7th Cir.1987)). Labor-management disputes that arise under the RLA are classified either as "major disputes" or "minor disputes." The "major dispute"/"minor dispute" distinction is es-sential in that it determines which of the two RLA labor-management dispute resolution procedures a rail carrier employer and its unions must follow when a disagreement arises as to matters affecting employees represented by those unions. *Railway Labor Executives Association v. Norfolk & Western Railway Co.*, 833 F.2d 700, 703–04 (7th Cir.1987).

> If a dispute is major, the parties must attempt to resolve it through negotiation, mediation [by the National Mediation Board] and possible presidential intervention [as contemplated by the procedures set forth in 45 U.S.C. §§ 154–160]. If a major dispute cannot be resolved, the union can strike in support of its position. If a dispute is minor, the parties first must attempt to resolve their dispute through negotiation. If negotiation fails, however, the parties must submit their minor dispute to the National Railway Adjustment Board for resolution. The NRAB's jurisdiction over minor disputes is exclusive. A minor dispute cannot be the subject of a strike.

*Id.* at 704 (citations omitted).

The terms "major dispute" and "minor dispute" are nowhere defined in the RLA. Rather, as our Court has previously observed, the "terminology is drawn from judicial gloss on the statute" that finds its origin in the U.S. Supreme Court's decision in *Elgin, Joliet & Eastern Railway v. Burley*, 325 U.S. 711, 722–27, 65 S.Ct. 1282, 1289–91, 89 L.Ed. 1886 (1945). *National Railway Labor Conference v. International Association of Machinists and Aerospace Workers*, 830 F.2d 741, 746 (7th Cir.1987).

The distinction between major disputes and minor disputes is an imprecise one. *RLEA*, 833 F.2d at 703. Nevertheless, it is clear that the primary point of reference in drawing this bifurcation is the collective bargaining agreement between the rail carrier and the involved union(s). *Chicago & North Western Transportation Co. v. International Brotherhood of Electrical Workers, Local Union No. 214*, 829 F.2d 1424, 1427 (7th Cir.1987). Thus, in *Burley, supra*, the Supreme Court defined major

disputes and minor disputes in the following manner.

[The term major dispute] relates to disputes over the formation of collective bargaining agreements or efforts to secure them. They arise when there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of legal rights for the future, not to assertion of rights claimed to have vested in the past.

[The term minor dispute] contemplates the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, *e.g.* claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

325 U.S. at 723, 65 S.Ct. at 1290.

Our Court has characterized the difference in the two types of RLA labor disputes in several different ways. A major dispute has been variously described as one "over the formation or alteration of [a] collective bargaining agreement[ ]," *Machinists*, 830 F.2d at 746, or as an "attempt to create a contract or change the terms of a contract," *IBEW*, 829 F.2d at 1427. *Accord Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794, 797 (1st Cir.), *cert. denied*, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986). Consistent with the approach we have taken is the view of the Eighth Circuit which places within the major dispute category a proposed action by a rail carrier that "is a clear departure from the collective bargaining agreement." *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern Railroad Co.*, 802 F.2d 1016, 1017 (8th Cir.1986).

An examination of our Circuit's earlier decisions disclose the following characterizations of minor disputes under the RLA. "A minor dispute is a dispute over the interpretation of an existing contract." *IBEW*, 829 F.2d at 1427. "Minor disputes do not involve fundamental changes in labor-management relations but rather focus on whether a change is arguably comprehended within an already existing collective bargaining agreement." *Burlington Northern*, 829 F.2d at 619. Our cases make one thing clear. In order to ascertain if a dispute between a rail carrier and the union(s) representing its employees is major or minor, we "must determine whether the dispute can be resolved by reference to an existing collective bargaining agreement." *RLEA*, 833 F.2d at 704.

If the dispute can be resolved by reference to the parties' collective bargaining agreement, *i.e.*, if it is "arguably comprehended within an already existing collective bargaining agreement," it is a minor dispute. *Burlington Northern*, 829 F.2d at 619. In ascertaining whether a rail carrier's disputed actions are justified by or fall within the parameters of an existing collective bargaining agreement, the courts are permitted to look to the "settled past practices of the parties" under that agreement. *See Brotherhood of Maintenance of Way Employees*, 802 F.2d at 1017. *See also Machinists*, 830 F.2d at 747 ("Collective bargaining agreements in the railroad industry are, of course, contracts, and the custom and usage in the trade or the past course of dealing among the parties may well be relevant to a determination of any ambiguity in the contractual language."). "Within the railroad industry in particular, it is common practice to omit from written agreements non-essential practices that are acceptable to both parties." *RLEA*, 833 F.2d at 705.

■ Thus, in determining the range of employer actions that can arguably be said to fall within the scope of a collective bargaining agreement, we may properly consider both the agreement's express terms and "any well established practices that

constitute a 'course of dealing' between the carrier and employees." *RLEA*, 833 F.2d at 705 (footnote omitted) (quoting *Detroit and Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 154, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969)). Our Court has acknowledged that an established past practice cannot be used to contradict the express language of a collective bargaining agreement in an effort to transmute a major dispute into a minor dispute. *RLEA*, 833 F.2d at 705, n. 4 (citing *Brotherhood of Railway Carmen v. Norfolk & Western Railway*, 745 F.2d 370, 376–78 (6th Cir.1984)). *See also Machinists*, 830 F.2d at 747 ("arguments from past practice may be relevant to the characterization of a dispute as major or minor, but it is also true that they most often have only a limited impact on the characterization") (footnote omitted).

In deciding whether a dispute can be resolved by reference to the existing collective bargaining agreement(s) and relevant established past practice, "[t]he court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision." *RLEA*, 833 F.2d at 704. *See also Maine Central Railroad Co. v. United Transportation Union*, 787 F.2d 780, 782 (1st Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986) (holding that where a rail carrier has presented evidence that arguably supports its claim of a contractually-based past practice covering a matter in dispute "the court's inquiry must end; it is not for it to weigh, and decide who has the better of the argument"). "Where the parties disagree over whether the dispute can be resolved by reference to an agreement the dispute is minor unless the claims of contractual justification are 'frivolous' or 'obviously insubstantial.'" *Machinists*, 830 F.2d at 746 (quoting *Atchison, Topeka and Santa Fe Railway v. United Transportation Union*, 734 F.2d 317, 321 (7th Cir.1984)). *See also RLEA*, 833 F.2d at 704; *Burlington Northern*, 829 F.2d at 619.

It is clear that the primary factor underlying this predisposition, in close cases, in favor of a "minor dispute" finding is the concern for minimizing the occurrence of strikes in the rail transportation industry. *See Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Co.*, 768 F.2d 914, 920 (7th Cir.1985). Rail unions are not permitted to strike over minor disputes. *Burlington Northern*, 829 F.2d at 619 (citing *Brotherhood of Railroad Trainmen v. Chicago River & Indian Railway Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)). *See also RELA*, 833 F.2d at 704 ("A minor dispute cannot be the subject of a strike.").

> The primary objectives of the RLA are to promote stability in labor relations in the railroad industry and prevent strikes. Because a major dispute can escalate into a strike, if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor.

*RLEA*, 833 F.2d at 705 (citing *Detroit and Toledo*, 396 U.S. at 154, 90 S.Ct. at 301; *Leu*, 820 F.2d at 827; and *Atchison*, 768 F.2d at 920). In addition, we have cited the "need to protect the [NRAB's] exclusive jurisdiction over minor disputes" as another reason for the corollary that "'when in doubt, the court construes disputes as minor.'" *Machinists*, 830 F.2d at 746 (quoting *Atchison*, 768 F.2d at 920).

### B. The Major Dispute–Minor Dispute Determination

■ Our review of the district court's determination that the present dispute between C & NW and RLEA is a minor dispute under the RLA scheme is guided by the preceding summary of the extensive relevant precedent in our Circuit. Because C & NW claims that its controversy with RLEA arising from the proposed sale is a minor dispute, it can properly be assigned the burden of proving that assertion. The preceding analysis demonstrates that the employer's burden is "relatively light". *Burlington Northern*, 829 F.2d at 619. *See also Brotherhood of Maintenance of Way Employees*, 802 F.2d at 1022.

■ RLEA attempts to frame this dispute as one pertaining to the changed pay, seniority status and working conditions that will be encountered by the current C & NW employees whose employment rights will be affected by the proposed sale of the Duck Creek South line. RLEA insists that C & NW does not have a right under the collective bargaining agreements to abolish jobs within the context of a rail line sale and concurrently refuse to negotiate over the effects of that sale on its present employees. The RLEA constituent unions have served § 6 notices on C & NW seeking changes in the current collective bargaining agreements pertaining to the pre-sale/job abolishment and post-sale/job abolishment status of the employees who will be affected by the proposed sale. Given that fact, and because no provision of the current agreements expressly grants C & NW the right to sell a rail line and abolish jobs without negotiating over the effects of that sale, RLEA insists that C & NW cannot be permitted to claim that this controversy is one that can be resolved based on the existing collective bargaining agreements.

C & NW first notes two aspects of RLEA's position which it believes to be of significance. RLEA does not challenge C & NW's right under the collective bargaining agreements to abolish jobs once the work assigned to those positions is no longer available. Second, RLEA concedes that the present contractual provisions, unless changed, will continue to govern the employment-related rights of the current C & NW employees who will be affected by the Duck Creek South line sale. In its own substantive argument, C & NW contends that the job abolishment, layoff and reassignment actions it will take as a result of the Duck Creek South line sale are fully authorized by the collective bargaining agreements. C & NW insists further that it has for some twenty years taken similar actions (*i.e.*, discontinuing operations on certain portions of track and concurrently abolishing jobs and laying off and reassigning employees) without objection from the RLEA unions (with one recent exception)

and without a demand from the unions that the § 6 RLA procedures be initiated.

We are not concerned with the relative merits of the parties' arguments as to whether the actions C & NW would take with regard to the employees affected by the Duck Creek South line would violate or are sanctioned by the current collective bargaining agreements between C & NW and the RLEA unions. *See RLEA*, 833 F.2d at 705; *Maine Central Railroad*, 787 F.2d at 782. Ascertaining the actual validity of C & NW's claims of contractual justification is a task falling outside the limited role of the federal courts in rail carrier-union disputes arising under the RLA. Rather, our charge is to determine if the subject matter of the parties' dispute is "arguably comprehended" within, and potentially amenable to resolution by reference to, their existing collective bargaining agreements and the attendant established past practices not in conflict with the terms of those agreements. *See RLEA*, 833 F.2d at 704–05; *IBEW*, 829 F.2d at 1427; *Burlington Northern*, 829 F.2d at 619; *Machinists*, 830 F.2d at 747.

We have carefully evaluated the claims of the parties and examined the evidence in the record as to the terms of their collective bargaining agreements and the relevant past practices attendant to those agreements. There can be no doubt that the agreements and past practice arising thereunder embrace matters of job abolishment, layoff and reassignment resulting from a layoff with regard to the individuals affected by the Duck Creek South line sale who are able to retain their employment with C & NW. In addition, C & NW's claim that the agreements and attendant past practices extend to the related matters of its obligation to employees who are laid off after their positions are abolished appears to have at least some factual support.

It is true that the agreements are silent with regard to C & NW's obligation to provide, or its ability to avoid, the type of ameliorative, post-termination benefits sought by the RLEA unions. Thus, C & NW's contention that the collective bar-

gaining agreements contemplate abolishment of jobs without any of the severance-related benefits sought by the RLEA unions is based primarily, if not exclusively, on its claims as to the past practice or course of dealing under the provisions of the agreements that pertain to job abolishment and layoff. However, because nothing in the record indicates that the purported body of past practice relied on by C & NW is inconsistent with the express provisions of the agreements, this argument by C & NW cannot be rejected out of hand.

Our analysis leaves us convinced that even though C & NW's interpretation of the agreements and its contentions are subject to challenge, they are at least plausible. *See Machinists*, 830 F.2d at 748. Because C & NW's position has at least an arguable basis in the collective bargaining agreements and relevant past practice, it cannot be said to constitute the type of clear departure from those agreements necessary to trigger a finding of a § 6 major dispute under the RLA format. *See Brotherhood of Maintenance of Way Employees*, 802 F.2d at 1022.[2]

■ Our precedent clearly dictates that in a circumstance such as the present one, where a rail carrier and a union(s) disagree as the proper categorization of a labor dispute under the RLA, the federal courts must delineate a matter a minor dispute unless the carrier's claims of contractual justification are so frivolous or obviously insubstantial as to indicate that it is attempting to circumvent the § 6 RLA major disputes resolution procedure. *Machinists*, 830 F.2d at 746, *RLEA*, 833 F.2d at 704; *Burlington Northern*, 829 F.2d at 619. This is particularly true in controversies involving job abolition. *Machinists*, 830 F.2d at 749 ("It has been held before that where a collective bargaining agreement is susceptible of a non-frivolous interpretation allowing job abolition, disputes over actions effecting such job abolition are minor."). Given the arguable contractual/past practice bases for C & NW's position, we cannot conclude that it is either frivolous or obviously insubstantial.

Juxtaposition of the foregoing analysis as to the nature of the present controversy between C & NW and the RLEA-represented unions with the precedent in our Circuit

---

**2.** The primary focus of RLEA's concern with the proposed Duck Creek South line sale is the fact that the current collective bargaining agreements between C & NW and the RLEA unions do not provide their members who will lose their jobs with C & NW with the type of additional severance benefits formerly imposed as a matter of course by the ICC as a condition of approving a proposed rail line sale. The record indicates that former C & NW employees who go to work for FRVR will experience a reduction in pay and benefits and will lose the seniority standing they had accrued with C & NW. That the current collective bargaining agreements between C & NW and the RLEA member unions do not contain provisions pertaining to the pay, benefits and seniority standing of C & NW employees whose jobs are abolished and who subsequently accept employment with another rail carrier is not surprising.

RLEA attempts to bring the issues of the post-job abolition pay, benefits and seniority status of the individuals who will go to work for FRVR within the scope of the bargaining relationships between its constituent unions and C & NW by characterizing the change in the status of the current C & NW employees whose jobs with C & NW will be abolished by the Duck Creek South line sale as a "transfer" of their employment by C & NW to FRVR. That charac-

terization is inaccurate. Those employees whose employment with C & NW is terminated who choose to accept positions with FRVR will not be transferred by C & NW. Their jobs with C & NW will be abolished. Thus, if and when the Duck Creek South line sale is consummated, C & NW's actions as an employer rail carrier under the RLA will be limited to those concerned with the abolition of existing jobs and the layoff and/or reassignment of the employees whose positions are abolished. It is within this context that the minor dispute/major dispute determination called for by the RLA must be made in this case.

The actions of RLEA's member unions are understandable, especially in light of the ICC's current predisposition against imposing labor protective provisions as a prerequisite to approving rail line sales of the type at issue here. But in order to achieve the outcome sought by RLEA, *i.e.*, an order compelling C & NW to engage in negotiations under the § 6 RLA major dispute procedures and eventually submit its disagreements with the unions to the full range of dispute resolution devices provided thereunder, we must conclude that there are no bona fide issues of contract interpretation presented here. Given the nature and context of the current dispute between C & NW and the RLEA member unions, we are unable to reach that conclusion.

and the remaining body of relevant RLA law, compels us to agree with the district court's categorization of this matter as a minor dispute under the RLA.[3] The district court's holding to that effect will be affirmed.

### C. The Remaining RLA Issues

■ The categorization of this matter as a minor dispute under the RLA establishes several additional facts relevant to our review of the district court's actions. First, because it involves a minor dispute, this controversy is within the exclusive jurisdiction of the NRAB. *RLEA*, 833 F.2d at 704. *See also Missouri Pacific Railroad Co. v. United Transportation Union*, 782 F.2d 107, 110 (8th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987). *IBEW*, 829 F.2d at 1428 ("Minor disputes ... must be referred to binding arbitration under the auspices of the National Railroad Adjustment Board.") The

role of the federal courts in RLA minor disputes is very limited. Although they may determine the proper classification of a dispute under the RLA scheme, federal courts are prohibited from becoming involved in the merits of minor disputes. *Burlington Northern*, 829 F.2d at 620 ("The Railway Labor Act ... prohibits federal courts from becoming involved in minor disputes. Minor disputes must be resolved through an arbitration process that is subject to very narrow judicial review."). Therefore, we conclude that the district court correctly determined that because the present controversy is a minor dispute under the RLA, it is subject to the exclusive jurisdiction of the NRAB, and must be resolved under the Act's § 3 RLA procedures. 45 U.S.C. § 153.

■ The second significant ramification of the minor dispute categorization pertains to the district court's determination

---

**3.** We have carefully examined the three key cases relied on by RLEA to support its claim that this case involves a major dispute under the RLA and we believe that none of the three is pertinent to our analysis. *Railway Labor Executives Association v. Pittsburgh & Lake Erie Railroad Co. ("P & LE")*, 845 F.2d 420 (3d Cir.1988), does present a fact situation similar to the present case. However, there are two distinct features of the fact situation in that case which distinguish it from our case. First, *P & LE* did not involve a rail carrier selling a small portion of its rail lines to a non-carrier. Rather, the rail carrier in *P & LE* proposed to sell its entire rail operation to a non-carrier corporation. Second, and more importantly, there is no indication in the analysis by the Third Circuit in *P & LE* that it considered the effect of a claim by a rail carrier employer that its actions pertaining to the employees whose jobs were to be abolished by the proposed sale were sanctioned by and proper under the collective bargaining agreements between the carrier and the unions representing its employees.

The contractual base relied upon by C & NW is the key to our analysis of the minor dispute/major dispute bifurcation under the RLA scheme. Because the Third Circuit in *P & LE* did not address that topic in any way, we do not find its analysis of the minor dispute/major dispute RLA issue to be relevant or persuasive. We note further that the Third Circuit's subsequent decision in *Railway Labor Executives Association v. Consolidated Rail Corporation*, 845 F.2d 1187 (3d Cir.1988), can also be distinguished from our case in that the Court therein

determined that the issue in dispute, a drug testing program unilaterally instituted by the rail carrier, was not within the terms and conditions of employment incorporated in the parties' collective bargaining agreement. *Id.* at 1193–94. Unlike the Third Circuit in *Conrail*, we have determined that the issues in dispute in our case are at least arguably embraced within the scope of the collective bargaining agreements between the RLEA unions and C & NW.

We also believe that the holding of the Fifth Circuit in *United Industrial Workers v. Board of Trustees of the Galveston Wharves*, 351 F.2d 183 (5th Cir.1965), is not relevant to our analysis. *Galveston Wharves* involved a rail carrier who was effectively terminating all of its rail operations by leasing its rail facilities to another corporation. The key to the Fifth Circuit's rejection of the rail carrier's claim that its dispute with the union representing its employees was one proper for submission to the NRAB was the finding that the carrier's action in leasing out its entire rail operation was neither a "layoff" nor an exercise of the carrier's management prerogatives under the collective bargaining agreement. *Id.* at 189. Rather, the Court viewed the carrier's action, and the dispute itself, as one involving the termination of a collective bargaining agreement that triggered the RLA § 6 major dispute resolution procedures. *Id.* at 189–90. Nothing in *Galveston Wharves* compels us to reach the result in a case, like ours, involving a sale by a rail carrier of a small portion of its track while maintaining the remainder of its rail operations and continuing to honor its collective bargaining agreements. Therefore, we deem that case inapposite here.

that the strike threatened by the RLEA member unions should be enjoined. Strikes over minor disputes violate the RLA and may be enjoined by the federal courts in order to effectuate the RLA's purpose to provide for the compulsory arbi-. tration of such matters by the NRAB. *Machinists*, 830 F.2d at 749 (citing *Chicago & Indian River*, 353 U.S. at 40–42, 77 S.Ct. at 640–41 (1957), and *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railway Co. (M–K–T)*, 363 U.S. 528, 531, 80 S.Ct. 1326, 1328, 4 L.Ed.2d 1379 (1960)). *See also IBEW*, 829 F.2d at 1428; *Chicago & Northwestern Transportation Co. v. United Transportation Union*, 656 F.2d 274, 277 (7th Cir.1981) (citing *Locomotive Engineers v. Louisville & Nashville Railroad Co.*, 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963)).

Thus, it is clear that the federal courts may issue injunctions against strikes in minor disputes in order to protect the NRAB's exclusive jurisdiction over such matters. Because injunctions barring strikes in minor disputes are necessary to ensure the proper functioning of the § 3 RLA procedures, they are not proscribed by the *Norris–LaGuardia Act*. *Chicago River*, 353 U.S. at 40–41, 77 S.Ct. at 640–41. *See also Missouri Pacific Railroad Co.*, 782 F.2d at 110 (citing *Louisville & Nashville Railroad Co.*, *supra*). For these reasons we must conclude that the district court acted properly in granting C & NW's motion for a preliminary injunction prohibiting the RLEA unions from striking during the pendency of the NRAB's adjudication of the current dispute.

▪ One final question remains: the propriety of the district court's determination that it was without jurisdiction to grant RLEA's motion for a preliminary injunction to bar the Duck Creek South line sale. RLEA's argument in support of its motion is based solely on the claim that the present controversy is a major dispute under the RLA scheme. Once a district court finds that a major dispute exists, it may enjoin both the rail carrier and the union(s) from altering the status quo during the course of the negotiations and other impasse resolution procedures mandated by § 6 of the RLA. *Boston & Maine Corp.*, 788 F.2d at 797 (citing *Detroit & Toledo*, 396 U.S. at 155, 90 S.Ct. at 302). However, in the absence of a finding that a major dispute exists, a district court is without jurisdiction to issue a broad status quo injunction. *See Boston & Maine*, 788 F.2d at 797 (citing *Carbone v. Meserve*, 645 F.2d 96, 98 (1st Cir.), *cert. denied*, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). We have determined that the district court correctly categorized the parties' disagreements as to the proposed Duck Creek South line sale as a minor dispute. Accordingaly, RLEA's claim that a status quo injunction of the type normally issued in RLA major disputes should have been granted by the district court in this case is moot and can be dismissed. The district court was without jurisdiction to issue such an injunction.[4]

▪ It is true that the district court, in its discretion, could have conditioned the preliminary injunction barring the RLEA unions from striking on C & NW's abstention from consummating the Duck Creek South line sale.[5] In *Machinists, supra,* our Court observed that the Supreme Court has held that "if an injunction against strike activity is issued in a minor dispute the district court retains its traditional equitable power to balance 'competing claims of irreparable hardship' in light of the Railway Labor Act's mandate that the guideline for fashioning the injunction be preser-

4. Because we find in the RLA sufficient basis for holding that the district court was without jurisdiction to issue the status quo injunction sought by RLEA, we need not address the district court's holding that it was without jurisdiction to issue that injunction because it deemed RLEA's motion therefor an impermissible collateral attack on the ICC order approving the Duck Creek South line sale.

5. RLEA did not challenge the district court's refusal to indirectly proscribe the Duck Creek South line sale by conditioning the strike injunction on C & NW's willingness to postpone the sale until the NRAB procedures are completed. Nevertheless, to ensure a full and comprehensive treatment of the RLA issues presented by this case, we briefly address that question.

vation of the [NRAB's] jurisdiction." 830 F.2d at 750 (quoting *M–K–T,* 363 U.S. at 534–35, 80 S.Ct. at 1330). RLEA has failed to show that a prohibition of the Duck Creek South line sale is necessary in order to preserve the NRAB's jurisdiction.

If the NRAB rejects C & NW's interpretation of the collective bargaining agreements and determines that the employees who are displaced by the challenged rail line sale are entitled to relief, it will be able to order the necessary payment of monies and adjustments in seniority levels it deems necessary to make those employees whole. Thus, it cannot be inferred that the legal remedy available to the RLEA unions in this case (via the NRAB arbitration procedure) is inadequate. Further, RLEA has failed to demonstrate that an order barring the Duck Creek South line sale during the pendency of the NRAB's adjudication of this controversy is necessary to prevent any irreparable harm to its constituent unions or the employees they represent. Accordingly, we cannot conclude that the district court abused its discretion when it failed to condition the preliminary injunction barring a strike in this dispute on a suspension of the Duck Creek South line sale.

IV

Based on the foregoing analysis, we will affirm the order of the district court granting C & NW's motion for a preliminary injunction barring the RLEA member unions from striking pending adjudication of the parties' dispute by the NRAB and denying RLEA's motion for a preliminary injunction barring the Duck Creek South line sale. The Railway Labor Act and the attendant relevant case law provide a full

and proper basis for affirming the district court. Consequently, we need not resolve the additional issues, raised by the district court's opinion and addressed in the arguments of the parties, with regard to the effect of the Interstate Commerce Act.[6]

The order of the district court is AFFIRMED.

6. In their briefs, C & NW and Plaintiff–Intervenor/Appellee Interstate Commerce Commission ask us to decide two additional issues raised by the interface in this case between the Railway Labor Act and the Interstate Commerce Act. Those issues go to two questions: (i) whether RLEA's attempt to enjoin the Duck Creek South line sale constitutes an impermissible collateral attack on the ICC's decision to allow the sale to proceed; and (ii) whether the strike threatened by the RLEA unions could properly be enjoined by the district court in order to preserve what the ICC and C & NW maintain is the Commission's exclusive jurisdiction to determine "labor protection disputes" pertaining to the sale of rail lines. In the above analysis, we have determined that the relevant provisions of the RLA mandate that the injunction sought by the RLEA not issue and that the strike threatened by the RLEA unions be enjoined. Accordingly, we need not address the two additional Interstate Commerce Act-related issues raised by appellees.