**RAILWAY LABOR EXECUTIVES' ASSOCIATION, Appellant,**

v.

**CHICAGO AND NORTHWESTERN TRANSPORTATION COMPANY and Dakota, Minnesota and Eastern Railroad, Appellees.**

**State of South Dakota, Amicus Curiae/Appellee.**

**No. 87–5071.**

United States Court of Appeals, Eighth Circuit.

Nov. 29, 1989.

Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

## ORDER

On June 26, 1989, the Supreme Court granted a writ of certiorari in the above-entitled case. It then vacated the judgment of this court, — U.S. —, 109 S.Ct. 3207, 106 L.Ed.2d 558, and remanded the case to us for further consideration in the light of *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, 491 U.S. —, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (*P & LE*).

This court requested the parties to file letter briefs with respect to the application of *P & LE* to the instant case. After a careful review of the decision of the United States Supreme Court and the letter briefs, we revise our original opinion.

## I.

■ There is one important difference between the facts in *P & LE* and those in this case. In *P & LE*, the carrier sold all of its assets to a newly formed subsidiary. Here, the Chicago and Northwestern (C & NW) sold only a portion of its assets (826 miles of rail line and 126 miles of trackage in South Dakota) to a newly formed railway company. Thus, we must decide whether the Supreme Court's decision that a railway company need not bargain with the unions with *respect to a sale of all of its assets* to another corporation applies to a case in which a railway company sells only a portion of its assets.

We believe that C & NW was not required to bargain over the sale in this case prior to the sale's completion. The sale was approved by the I.C.C., the sale was for an unprofitable, discrete section of the railway that might have been abandoned but for the sale, and after the sale C & NW would have no relationship with the purchaser. Thus, we hold that C & NW was not obligated to serve a section 156 notice on the union in connection with the proposed sale nor was it obligated to maintain the status quo and postpone the sale beyond the time the sale was approved by the Commission and was scheduled to be consummated.

■ This holding does not, however, end the matter. We also believe that *P & LE* made it clear that a railroad selling all or a part of its assets is required to bargain about the *effects that the sale* will or might have on its employees:

> The disputed issue is whether P & LE was required to bargain about the effects that the sale would or might have upon its employees. *P & LE, in our view, was not entirely free to disregard the unions' demand that it bargain about such effects.*

*P & LE*, 491 U.S. at —, 109 S.Ct. at 2597, 105 L.Ed.2d at 435 (emphasis added). Moreover, C & NW can bargain about the effects of the sale even after the sale is consummated.

In *P & LE*, the Supreme Court held that the obligation to bargain over effects existed "only until the date for closing the sale arrived," which, of course, would not occur in this case until the ex parte 392 exemption became effective and the transfer occurred. We are convinced that the Supreme Court placed a time limitation on the

obligation to bargain because after that date, the selling railroad would have no assets and no employees. Here, the selling railroad will retain the major portion of its assets and will continue to employ persons who are members of the labor organizations that are parties to this case. Thus, C & NW can bargain about the effects of the sale without delaying or upsetting the sale.

## II.

■ We reject the suggestion of the C & NW and of the dissent that the dispute between the parties is a minor dispute and thus subject to arbitration. The facts here are quite close to those in *P & LE*, and the Supreme Court there held that the dispute was a major one and that the railroad company was obligated to bargain with the union as to the effects of the sale. The union is not seeking an interpretation of the express or implied terms of the collective bargaining agreement nor is it seeking a ruling that a past practice should be enforced. Rather, it is seeking to negotiate over the effects of a sale on those C & NW employees who are affected by it. No clear reason has been advanced by the C & NW as to why we should categorize this dispute differently.

We have no quarrel with the test advanced by the dissent to determine whether a dispute is a major or a minor one. *Post* at 1029. That test was approved by the United States Supreme Court in *Consolidated Rail Corp. v. Railway Labor Executives Ass'n,* — U.S. —, —, 109 S.Ct. 2477, 2482, 105 L.Ed.2d 250, 264 (1989), and this court in *Brotherhood of Maintenance of Way Employees v. Burlington Northern R.R.,* 802 F.2d 1016, 1022 (8th Cir. 1986). Here, C & NW claims that the dispute over what benefits, if any, the railroad employees should receive only relates to the execution of the agreement and should be arbitrated. We disagree. This fact can be illustrated by attempting to frame the issue that would be decided by an arbitration board established under the Railway Labor Act.

C & NW suggested before the district court for the Northern District of Illinois in a case they argue is controlling, that the issue in a case such as this should be whether C & NW violated its agreements with the unions. *Chicago & Northwestern Railway v. Railway Labor Executives Ass'n,* No. 88 C 444, slip op. (N.D.Ill. Oct. 6, 1989). We disagree. Both parties concede that their agreements neither permit nor prohibit the C & NW from selling a portion of its business.

Nor should or would the issue be as formulated by the district court in that case: "what treatment, in terms of pay (severance or otherwise), seniority rights, benefit rights, transfer rights, etc., the employees of the C & NW (who are affected by the line sale) are entitled to in terms of contractual provisions and attendant past practices." *Id.* at 6. The question thus phrased would give the arbitrator a roving commission to invent terms which were never agreed to by the parties.

## III.

The Supreme Court in *P & LE* has determined that disputes of this nature are major ones. In light of *P & LE*, we conclude that the C & NW is obligated to bargain with the unions with respect to the *effects* of the sale only. Bargaining should commence promptly and proceed in accordance with the provisions of the Railway Labor Act.

Under our decision the sale will stand, and the right of the C & NW to exercise its right to sell all or a part of its holdings will be preserved. Thus, the unions cannot prevent the sale. As in *P & LE*, however, the railroad company will be required to bargain over the effects of the sale on its employees, thus accomplishing the intent of Congress to balance the rights of employers and workers.

We vacate our opinion of May 31, 1988 and remand to the district court with directions that it enter an order requiring the C & NW to bargain on request of the Railway Labor Executives Association with respect to the effects of the sale on the employees of C & NW.

MAGILL, Circuit Judge, concurring in part and dissenting in part.

I concur in the order except for the majority's decision that the dispute over the effects of the sale is major.[1] I dissent from that decision because the district court has not made the factual findings that would enable us to determine whether this dispute is major or minor under the standard approved by the Supreme Court in *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, — U.S. —, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (*Conrail*). Under that standard, the dispute is minor if C & NW's claim that the effects of the sale are authorized by the parties' agreements and past practices is "arguably justified," i.e., is neither "frivolous" nor "obviously insubstantial." *Id.* 109 S.Ct. at 2482, 2485, 2489. I would remand for an initial disposition of this issue by the district court based on factual findings regarding the parties' collective bargaining agreements and attendant past practices.[2] In prior proceedings, both this court and the district court resolved this case on the basis of the supposed superseding force of the Interstate Commerce Act, and accordingly did not reach the major-minor dispute issue presented under the Railway Labor Act (RLA).[3] *See Railway Labor Executives' Ass'n v. Chicago & North-*

1. I agree that *if* this dispute is in fact major and not minor, then C & NW must engage in effects bargaining even though the sale has been consummated.

2. This issue has clearly been preserved. C & NW moved for summary judgment on the minor dispute ground in the district court, but the case was decided in its favor on an alternate basis. C & NW then raised its minor dispute claim on the unions' appeal to this court, and raises it again on remand from the Supreme Court.

3. The unions are obliged to seek labor protection via the RLA procedures because congressional enactment and agency rulings have all but foreclosed the availability of such protection from the Interstate Commerce Commission in short-line sales to new carriers. A background explanation is provided in *FRVR Corporation—Exemption Acquisition and Operation—Certain Lines of Chicago and North Western Transportation Company—Petition for Clarification,* Finance Docket No. 31205, slip op. at 1–4 (January 28, 1988) (citations and footnotes omitted):

Since partial deregulation under the Staggers Rail Act of 1980 nearly 200 short-line and regional railroads have come into existence—partially reversing the industry's long trend of exit and contraction. These new roads now operate approximately 13 thousand miles of rail lines with 4 thousand workers handling more than 1.3 million carloads yearly.

Up until the Staggers Act, the principal means of exit for large "Class I" railroads from unprofitable markets had been through abandonment. Substantial deregulation of motor freight under the 1980 Motor Carrier Act threatened to accelerate this trend through new and increasingly efficient truck competition. Abandonment, by its nature, is most often a painful, disappointing process. It normally entails the permanent loss of jobs and railroad service, even though it has not always occurred in markets that are inherently unserviceable by rail. Markets that produce losses when operated by Class I railroads can produce profits for smaller, more efficient local carriers. These new carriers are potentially beneficial to nearly all concerned. They preserve rail service for the local economies and provide traffic feed for the larger carriers, enhancing employment prospects for rail labor—both on the smaller lines and throughout a reinvigorated Class I system—and they foster optimal recognition of the energy efficiencies and environmental benefits of rail service.

The trend away from abandonment and towards the formation of short-line and regional carriers developed in response to the new business environment created by the Staggers Act. This development was given impetus by a change in 1982 in Commission labor protection policy which was in part based upon a provision of the Staggers Act which establishes a branch line sale process in which labor protection was foreclosed by the statute. In the past, the typical sale of a short-line carrier might have been conditioned upon comprehensive (and potentially quite expensive) labor protection. By 1982 the Commission had determined that the expense of labor protection foreclosed short-line development, forcing the less attractive abandonment alternative or an abandonment and sale under the provisions of 49 U.S.C. 10905. As labor protection in short-line sales to new entrants is within the Commission's discretion, the Commission began to withhold protection in individual applications on the three-part theory that (1) in doing so rail service would be preserved, (2) the new railroads provided the best prospect for protecting the employment prospects of the affected labor and (3) it made no sense to force railroads to go through the more cumbersome process of abandonment under 49 U.S.C. 10903 and sale under 49 U.S.C. 10905 to achieve the same result. After consideration of scores of individual applications, the Commission decided in a 1986 notice and comment rulemaking that the devel-

*western Transp. Co.,* 848 F.2d 102 (8th Cir.1988), *vacated and remanded,* —— U.S. ——, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989) (mem.).

The majority completely ignores the absence of the requisite factual findings and, as a consequence of their absence, only purports to apply the *Conrail* standard without actually doing so. By reaching its decision on the major-minor dispute issue in this manner, the majority in essence creates a per se rule whereby disputes over the effects of short-line sales are major as a matter of law, irrespective of a claim that the effects are sanctioned by agreements and past practices. Clearly, nothing in *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* —— U.S. ——,

109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (*P & LE*), even begins to suggest such a rule exempting these disputes from the analysis required by *Conrail.*

The majority's decision that the unions' request for effects bargaining presents a major dispute is premised on the view that "[t]he facts here are quite close to those in *P & LE.*" *Ante* at 1026. However, *P & LE* must be distinguished insofar as the railroad there did not assert that the effects of the sale were authorized by existing agreements and past practices.[4] Without such a claim, the *Conrail* standard is obviously inapplicable. Indeed, if the railroad does not make a contractual justification claim in response to a union request for effects bargaining, there can be little

opment of new small railroads was overwhelmingly beneficial and should be encouraged and allowed to proceed with a minimum of regulatory cost and delay. The Commission issued rules exempting certain classes of line sales from drawn out Commission regulation, retaining for itself the unqualified right to review and correct any unique problems that might arise out of exceptional circumstances. [*Ex Parte No. 392* (Sub No. 1), *Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901,* 1 I.C.C.2d 810 (1986), *review denied sub nom. Illinois Commerce Commission v. ICC,* 817 F.2d 145 (D.C.Cir.1987).]

The Commission's policy has been validated by practical results. New railroad formation quickened, abandonments fell, service was maintained and typically improved, and rail jobs that might otherwise have been lost were preserved. Most observers supported and welcomed the Commission's policy initiative, but it has been consistently opposed by organized rail labor. Under the rules adopted in 1986, opposition to individual transactions is presented in petitions to revoke the grant of exemption. Such petitions have been filed in approximately 20 of the 120 transactions processed under the 1986 rules. Where petitions to revoke are filed, the Commission evaluates the basis for the revocation request, and has well-defined authority to correct any abuses that are shown. The Commission's authority includes the power to impose labor protective conditions through partial revocation, although under the rules this step will be taken only where exceptional circumstances are shown. The Commission would consider as exceptional, situations in which there was misuse of the Commission's rules or precedent, or where existing contracts specified that line sales were subject to procedural or substantive protection. Further, the exemp-

tion will be modified where labor can demonstrate injury that was unique, disproportionate to the gains achieved for the local transport system, and which can be compensated without causing termination of the transaction or substantially undoing the prospective benefits of the Commission's existing policy for other communities and locales.

4. The district court in *P & LE* stated that "[t]here appears to be little argument that the dispute at hand [over effects of the sale] constitutes a 'major' dispute." *Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R.,* 677 F.Supp. 830, 835 (W.D.Pa.1987), *aff'd,* 845 F.2d 420 (3d Cir.1988), *rev'd,* —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989). As the Seventh Circuit has observed, "there is no indication in the analysis by the Third Circuit in *P & LE* that it considered the effect of a claim by a rail carrier employer that its actions pertaining to the employees whose jobs were to be abolished by the proposed sale were sanctioned by and proper under the collective bargaining agreements between the carrier and the unions representing its employees." *Chicago & North Western Transp. Co. v. Railway Labor Executives' Ass'n,* 855 F.2d 1277, 1286 n. 3 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988). The Supreme Court likewise did not mention a contractual justification claim and its perfunctory analysis appeared to take it as uncontested that the dispute over effects was major. *See P & LE,* 109 S.Ct. at 2597. Certainly, nothing in the Court's opinion suggests or implies that all short-line sales automatically require effects bargaining regardless of a claim that the effects of the sale are authorized by agreements and past practices. There is simply no basis for the majority's categorical assertion that "[t]he Supreme Court in *P & LE* has determined that disputes of this nature are major ones." *Ante* at 1026.

doubt that the dispute in question is major. *See Conrail*, 109 S.Ct. at 2481 (line between major and minor disputes "looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action"). In contrast to *P & LE*, in this case C & NW claims that job abolishments and other effects of the short-line sale are authorized by its existing agreements with the unions and attendant past practices. Specifically, C & NW contends that the force-reduction provisions of the collective bargaining agreements give it the right to abolish jobs for any reason whatever upon providing the notice prescribed by the agreements. C & NW emphasizes its further contention that this interpretation of the agreements is confirmed by past practices regarding job abolishments in its over 5000 miles of abandonments since 1968. It is well established that long-standing past practices not only shed light on the meaning of express terms of collective bargaining agreements, but can themselves ripen into implied terms of the agreements. *See, e.g., Conrail*, 109 S.Ct. at 2485 (noting that "collective-bargaining agreements may include implied as well as express terms" and that "the parties' 'practice, usage and custom' is of significance in interpreting their agreement"). Because of C & NW's contractual justification claim, and in particular its heavy reliance on past practices, it is necessary to remand for factual findings to which the *Conrail* standard can be applied. Contrary to the import of the majority's holding, *P & LE* cannot be read to render the dispute here major as a matter of law.

The majority's position violates the fundamental principle that "factfinding is the basic responsibility of district courts, rather than appellate courts." *DeMarco v. United States*, 415 U.S. 449, 450 n. *, 94 S.Ct. 1185, 1186 n. *, 39 L.Ed.2d 501 (1974) (per curiam). It is elementary that when the district court has failed to make essential factual findings, the appropriate course is "a remand for further proceedings to permit the trial court to make the missing findings." *Pullman–Standard v. Swint*, 456 U.S. 273, 291, 102 S.Ct. 1781, 1791, 72

L.Ed.2d 66 (1982). More specifically, remand in this case is called for by our previous cases addressing the proper course for deciding whether a dispute is major or minor. That decision "turns upon the facts in each case" and "involves first a determination of factual issues, and then conclusions of law based on those findings." *Missouri Pacific Joint Protective Bd. v. Missouri Pac. R.R.*, 730 F.2d 533, 537 (8th Cir.1984) (citation omitted). The crucial factual issues are the content of the parties' collective bargaining agreements and the nature and extent of past practices. *See Alton & Southern Lodge No. 306 v. Alton & Southern Ry.*, 849 F.2d 1111, 1114 (8th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3214, 106 L.Ed.2d 565 (1989). The district court's findings as to these factual issues may be reversed only if clearly erroneous. *Id.* Whether a dispute is major or minor based on those findings is a question of law which we review *de novo*. *International Ass'n of Machinists v. Soo Line R.R.*, 850 F.2d 368, 374 (8th Cir.1988) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). By dispensing with the underlying factual findings necessary for an informed and justifiable resolution of the major-minor dispute question, the majority departs from our established practice and strips the district court of its fact-finding role.

We should instead follow the path taken in *Missouri Pacific*, 730 F.2d 533, where we were presented with a situation virtually identical to that before us now. In that case, "the basic issue" was "whether the dispute is minor or major." *Id.* at 536. As here, the district court received some evidence on the issue but "did not inquire into whether the dispute involved is major or minor and made no factual findings in this regard." *Id.* We realized that "[i]n this posture the only way we could reverse and order [the relief sought by the appellant union] would be to decide as a matter of law that the dispute involved is a major one." *Id.* However, we could not reach such a decision because the railroad claimed that established past practices justified its actions, and we recognized that

"[i]n determining whether the dispute is major or minor the factual issues of [the railroad's] past practices and its operational changes are closely intertwined with the legal conclusions regarding the scope of the agreements between the parties." *Id.* at 537. Accordingly, we remanded the case, acknowledging that "the determination of whether the dispute is major or minor is, in the first instance, an issue for the district court to decide." *Id.* The majority provides no reason why remand is not equally necessary in the instant case. In particular, it does not explain how it can purport to apply the *Conrail* standard when the district court has made no factual findings on the major-minor dispute issue.

In *Conrail,* decided two days before *P & LE,* the Supreme Court held that "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." 109 S.Ct. at 2482. This court applied the same standard prior to its approval by the Supreme Court. In *Soo Line,* we stated that "[i]f the parties disagree whether the dispute can be resolved

by reference to an agreement, the dispute is minor unless the claims of contractual justification are 'frivolous' or 'obviously insubstantial.'" 850 F.2d at 376 (quoting First and Seventh Circuit decisions). Contractual justification imposes only a "light burden" on the railroad. *Conrail,* 109 S.Ct. at 2489. Accordingly, when in doubt, courts will construe disputes as minor.[5] *Soo Line,* 850 F.2d at 377.

I am unwilling to assume, as the majority effectively does, that factual findings by the district court would inevitably reveal that C & NW is unable to meet the light burden of establishing its contractual justification claim is neither frivolous nor obviously insubstantial. Recent decisions by the Second and Seventh Circuits have held that disputes over the effects of short-line partial sales were minor because in each case the railroad's contractual justification claim satisfied this standard. *CSX Transp., Inc. v. United Transp. Union,* 879 F.2d 990, 998–99 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 720 (1990); *Chicago & North Western Transp. Co. v. Railway Labor Executives' Ass'n,* 855 F.2d 1277, 1283–86 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988).[6] The district court in *C & NW* reaffirmed the

---

**5.** The railroad's light burden of persuasion is necessary to protect the National Railroad Adjustment Board's exclusive jurisdiction over minor disputes. *Soo Line,* 850 F.2d at 377. Minor disputes are resolved by compulsory and binding arbitration before the Board, or before other adjustment boards upon which the railroad and the unions agree. 45 U.S.C. § 153 (1982). In *Conrail,* the Supreme Court emphasized that making full use of the Board (or other adjustment boards) is important because it "help[s] to 'maintain agreements,' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry'"; it also "will assure that the risks of selfhelp are not needlessly undertaken, and will aid '[t]he peaceable settlement of labor controversies.'" 109 S.Ct. at 2484 (quoting Supreme Court decisions).

If a dispute is major, the RLA requires the parties to undergo a "virtually endless" process of bargaining and mediation. *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees,* 481 U.S. 429, 444, 107 S.Ct. 1841, 1850, 95 L.Ed.2d 381 (1987). Failure of the process "frees the parties to employ a broad range of economic selfhelp." *Conrail,* 109 S.Ct.

at 2484. The Supreme Court described the major dispute procedures in *P & LE:*

> The parties must confer, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.*

109 S.Ct. at 2589 n. 4 (citations omitted) (quoting *Railroad Trainmen v. Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969)).

**6.** It is worth noting that the circuit courts in *CSX* and *C & NW* did not address the major-mi-

holding in that case after reexamining it in light of *P & LE* and *Conrail*, noting that *Conrail* adopted the same standard used by the Seventh Circuit and specifically rejecting the unions' argument that *P & LE* required an opposite result. No. 88 C 444, slip op. (N.D.Ill. Oct. 6, 1989). The relevance of the *C & NW* case is increased by C & NW's assertion that it involved not only the same parties, but also the same agreements, past practices and contractual justification claim as the instant case. After a careful evaluation, the Seventh Circuit held that the dispute in *C & NW* was minor because:

> There can be no doubt that the agreements and past practice arising thereunder embrace matters of job abolishment, layoff and reassignment resulting from a layoff with regard to the individuals affected by the Duck Creek South line sale who are able to retain their employment with C & NW. In addition, C & NW's claim that the agreements and attendant past practices extend to the related matters of its obligation to employees who are laid off after their positions are abolished appears to have at least some factual support.

855 F.2d at 1284. In *CSX,* 879 F.2d at 1001, the Second Circuit observed that *C & NW* "addressed a fact situation almost identical to that presented here." The decisions in *CSX* and especially *C & NW* make it clear that, at a minimum, C & NW's claim warrants serious consideration and should not be disposed of in the summary fashion chosen by the majority in complete disregard of the lack of necessary factual findings.

After concluding *"P & LE* made it clear that a railroad selling all or a part of its assets is required to bargain" over effects of the sale, *ante* at 1025, the majority attempts to bolster its position by finding that the unions' section 6 notices [7] proposing new agreements to provide employee

nor dispute issue in the first instance as the majority does here. Rather, in each case the circuit court affirmed a district court determination that the dispute was minor. *CSX,* 879 F.2d at 1002; *C & NW,* 855 F.2d at 1286.

protection themselves render the dispute major. *Ante* at 1026. The majority fails to recognize that if C & NW's contractual justification claim satisfies the *Conrail* standard, then the unions' section 6 notices proposing new agreements to cover employees affected by the sale could not transform the situation into a major dispute. *CSX,* 879 F.2d at 1000–01; *see also Airline Pilots Ass'n v. Eastern Air Lines,* 863 F.2d 891, 900 (D.C.Cir.1988) (rejecting unions' "suggestion that the mere serving of § 6 bargaining notices changes the nature of the dispute"); *Missouri Pacific,* 730 F.2d at 536 n. 3 ("The serving of a section 6 notice is not determinative of whether the controversy involved is major or minor."). The unions in both *CSX,* 879 F.2d at 998, 1000, and *C & NW,* 855 F.2d at 1280, 1284, also served notices seeking new agreements to govern the effects of the short-line sales, but that did not change the minor disputes into major ones. As the Second Circuit observed in *CSX,* 879 F.2d at 1001, if existing agreements governed the abolishment of jobs in connection with the line sale, "rights which [the unions] might seek to obtain by bargaining for future agreements would manifestly be irrelevant to that controversy." *See also Air Line Pilots,* 863 F.2d at 900 ("a rule that allows a party to characterize all disputes as 'major' through a unilateral action such as serving § 6 notices on the other party is unwise and contrary to the two-track procedure of the RLA").

The majority ultimately concedes that the *Conrail* standard is controlling, *ante* at 1026, but then avoids actually applying it, which is not surprising since this concession cannot be reconciled with the majority's later reiteration of its view that *"P & LE* has determined that disputes of this nature are major ones." *Ante* at 1026. The majority cannot have it both ways. Either *P & LE* makes the dispute over effects major as a matter of law or the *Conrail* standard must be applied to deter-

7. Section 6 of the RLA, 45 U.S.C. § 156 (1982).

mine whether the dispute is major or minor. That the majority is unwilling to take the latter position, and unable to do so without remanding for factual findings, is evidenced by its utterly inadequate "analysis" of C & NW's contractual justification claim. It merely states that it disagrees with the claim without providing any explanation whatsoever as to how (or even whether) it determined that C & NW cannot meet the light burden of establishing the claim is neither frivolous nor obviously insubstantial. This silence speaks volumes for it confirms that no such explanation can be provided because the district court has not made the requisite factual findings. Furthermore, by declaring that it disagrees with C & NW's claim, the majority oversteps the bounds of the courts' limited role under the RLA and usurps the function of the National Railroad Adjustment Board (NRAB). *Conrail* emphatically reaffirmed the well-established rule that "under the RLA, it is not the role of the courts to decide the merits of the parties' dispute." 109 S.Ct. at 2488. Rather, the courts' role is confined to determining whether a contractual claim is "arguably justified." *Id.* at 2488–89.

In an effort to justify its failure to apply the correct legal standard, the majority attempts to show that the dispute is major by illustrating how a proper issue for arbitration could not be framed. *Ante* at 1026. Neither of the two points the majority makes using this curious approach supports its position. First, the undisputed fact that the parties' agreements neither permitted nor prohibited the sale itself is certainly relevant in determining whether C & NW was obligated to bargain over its *decision to sell, see P & LE,* 109 S.Ct. at 2592–93, 2596, but it says nothing about whether C & NW's contractual justification claim regarding the *effects of the sale* is either frivolous or obviously insubstantial. Indeed, the parties in *CSX* and *C & NW*

likewise never contended there were any agreements permitting or prohibiting the short-line sales. Second, the issue for arbitration defined by the district court in *C & NW,* quoted *ante* at 1026, which the majority says would be improper in this case, simply called for the NRAB to interpret existing express and implied agreements and then apply them to employees affected by the short-line sale.[8] Such an arbitration issue would be proper in the instant case if the dispute over effects is minor, as it was in *C & NW.* It obviously would be improper if the dispute is major, in which case the dispute would not even be subject to arbitration. The majority rejects the arbitration issue in *C & NW* as improper without first having actually applied the *Conrail* standard to determine whether the dispute is major (or explaining why the Seventh Circuit's decision in *C & NW* was incorrect). The majority thus rejects the possibility of framing a proper issue for arbitration in this case by positing the existence of a major dispute. Such circular reasoning is hardly persuasive. More importantly, one is left wondering how the majority can profess to know that a particular arbitration issue "would give the arbitrator a roving commission to invent terms which were never agreed to by the parties," *ante* at 1026, when the district court has made no factual findings regarding the parties' express and implied agreements.

Even assuming the dispute over effects is major, the majority errs by exceeding the contours of *P & LE* 's direction that certain union demands are excluded from effects bargaining. *P & LE* makes it clear that C & NW is not obligated to bargain about union demands that can only be satisfied by the purchasing railroad, the Dakota, Minnesota & Eastern Railroad (DM & E),[9] because such demands seek to change or dictate the terms of the sale, and thus in effect challenge the decision to sell itself. 109 S.Ct. at 2597. Although the majority

---

8. The district court in *C & NW* noted that "[t]his issue for arbitration is essentially the issue [previously] presented by C & NW to the NRAB" after the Seventh Circuit had held the dispute was minor. No. 88 C 444, slip op. at 6 (N.D.Ill. Oct. 6, 1989).

9. The short-line sale to DM & E was consummated on September 4, 1986. DM & E has owned and operated the line since that time.

correctly holds that C & NW was not required to bargain over the decision to sell, it fails to exclude from effects bargaining those matters which can only be implemented by the buyer. The unions contend that such matters are bargainable here, Appellant's Letter Brief at 13, and include in their demands for labor protection a proposal that DM & E assume the applicable C & NW agreements. *Id.* at 18 n. 9; Appellant's Brief at 9. Demands such as this are excluded from effects bargaining under *P & LE.*

I express no opinion as to whether the dispute over effects is major or minor.[10] I simply contend that this issue involves as yet undetermined facts essential to application of the controlling *Conrail* standard, and that we should therefore follow the course taken in *Missouri Pacific* by remanding for an initial disposition of the issue by the district court based on factual findings regarding the content of the parties' agreements and the nature and extent of attendant past practices. For these purposes, an additional record may be necessary.

**10.** Contrary to the majority's characterization of my position, *see ante* at 1026, I am not suggesting that the dispute over effects is minor. The majority seems to assume that we must resolve this issue one way or the other even though the present posture of this case does not allow us to do so.