CSX TRANSPORTATION, INC., Plaintiff,

v.

UNITED TRANSPORTATION UNION, F.A. Hardin, J.A. Cianciotti, R.W. Early, United Transportation Union, Yardmasters Department, B.R. Carver, Richard P. DeGenova, American Train Dispatchers Association, R.J. Irvin, Hugh E. Martin, Brotherhood of Locomotive Engineers, L.D. McFather, J.A. LeClair, Brotherhood of Maintenance of Way Employees, G.N. Zeh, B.J. Twigg, Transportation Communications International Union, R.D. Kilroy, Dwight A. Vance, L.H. Tackett, Transportation Communications International Union, C.E. Wheeler, M.L. Crawford, International Association of Machinists and Aerospace Workers, J.F. Peterpaul, A.J. Sarcone, W.D. Snell, International Brotherhood of Firemen and Oilers, J.L. Walker, D.S. Anderson, Sheet Metal Workers International Association, D.C. Buchanan, A.R. Hicks, International Brotherhood of Electrical Workers, E.P. McEntee, George L. Laitile, Brotherhood of Railroad Signalmen, V.M. Speakman, Jr., C.T. Green, Defendants.

AMERICAN TRAIN DISPATCHERS ASSOCIATION, Brotherhood of Maintenance of Way Employees, Brotherhood of Railroad Signalmen, International Association of Machinists and Aerospace Workers, International Brotherhood of Firemen and Oilers, Sheet Metal Workers' International Association, and Transportation Communications International Union (TCU), Plaintiffs,

v.

CSX TRANSPORTATION UNION, Defendant.

Nos. CIV–88–1404C, CIV–90–481C.

United States District Court, W.D. New York.

June 14, 1991.

Akin, Gump, Strauss, Hauer & Feld (Ronald M. Johnson, of counsel), Washington, D.C., and Kavinoky & Cook (Courtland R. LaVallee, of counsel), Buffalo, N.Y., for CSX Transp., Inc.

Highsaw, Mahoney & Clarke (John O'Brien Clarke and L. Pat Wynns, of counsel), Washington, D.C., and Collins, Collins & DiNardo (John F. Collins, of counsel), Buffalo, N.Y., for defendants in CIV–88–1404C and plaintiffs in CIV–90–481C.

## BACKGROUND

CURTIN, District Judge.

The parties to the present actions are CSX Transportation, Inc. ("CSXT"), a "carrier" within the meaning of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, First, and the United Transportation Union ("UTU") and American Train Dispatchers Association ("ATDA"), as well as other unions and individuals (hereinafter collectively referred to as the "Unions"), all of whom are "representatives" of former CSXT rail employees within the meaning of the RLA, 45 U.S.C. § 151, Sixth. They have been before this court previously. *Decker v. CSX Transp., Inc.*, 672 F.Supp. 674 (1987) (*"Decker I"*), *vacated,* 688 F.Supp. 98 (W.D.N.Y.1988), *aff'd sub nom., CSX Transp., Inc. v. United Transp. Union,* 879 F.2d 990 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990) (*"Decker II"*). These prior cases have outlined in extensive detail the factual background leading to the present disputes. *See id.* However, a brief review of that background is also in order here.

CSXT owns and operates approximately 21,000 miles of rail line. The prior and present disputes both arise from CSXT's efforts to sell 369 miles of rail line between Buffalo, New York, and Eidenau, Pennsylvania. CSXT sought to sell that line because of its marginal profitability shortly after acquiring it in 1987 from the Baltimore & Ohio Railroad ("B & O"), which had been merged into CSXT. As a result of that merger, CSXT assumed responsibility for all collective bargaining agreements that had existed between the former B & O and the Unions representing employees on the Buffalo–Eidenau line.

On September 16, 1987, CSXT entered into a letter of intent to sell the Buffalo–Eidenau line to a newly formed corporation, Buffalo & Pittsburgh Railroad, Inc. ("B & P"). As a corporation not previously in the railroad business, B & P was not statutorily required to employ, or to enforce the collective bargaining agreements of, any of the 226 former CSXT employees of the Buffalo–Eidenau line. *Decker II,* 688 F.Supp. at 101–02. Under its sales agreement with CSXT, however, B & P did pledge to offer jobs to at least 160 of those former employees, albeit on different terms. *Id.* at 101.

Given the significant loss of jobs which would result from the sale, and the potentially less favorable employment terms for those jobs that remained, the Unions sought to prevent the sale until bargaining between the Unions and CSXT over the effects of the sale could be completed. Accordingly, just prior to the signing of the letter of intent to sell, the Unions served notices on CSXT pursuant to RLA § 6, 45 U.S.C. § 156, seeking "an intended change in agreements affecting rates of pay, rules, or working conditions." *Id.* By filing these notices, the Unions sought to amend their then-existing collective bargaining agreements with CSXT to include or

strengthen labor-protective provisions during a line sale. The Unions acknowledged that these agreements did not provide sufficient labor protections in the event of a sale. *See Decker II,* 879 F.2d at 1000.[1]

To understand the Unions' actions, we must digress briefly to explain the importance of § 6 in the structure of the railroad industry's labor-management relations. In the railroad industry, new collective bargaining agreements are not always negotiated according to a predetermined schedule. *Cf. Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes,* 481 U.S. 429, 432, 107 S.Ct. 1841, 1844, 95 L.Ed.2d 381 (1987). Instead, the Railway Labor Act offers § 6, 45 U.S.C. § 156, which enables either party at any time, by filing the proper notice, to initiate negotiations over newly proposed provisions to such collective bargaining agreements. Section 6 then triggers an "elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation" between the parties. *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 148–49, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969). *See also id.* at 149 n. 14, 90 S.Ct. at 298 n. 14 (detailing negotiation steps). Most importantly for labor, however, until such negotiations are complete, § 6 requires preservation of the *status quo.*

> In *every* case where such notice of intended change has been given, ... rates of pay, rules, or *working conditions shall not be altered by the carrier* until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board....

RLA § 6, 45 U.S.C. § 156 (emphasis added). This status quo obligation extends also to the unions, who may not strike during negotiation periods. *Shore Line,* 396 U.S. at 149–50, 90 S.Ct. at 298–99. In this way, Congress established a framework to stabilize the often volatile labor-management relations in the railroad industry. *Chicago & Northwestern Transp. Co. v. Railway Labor Executives' Ass'n,* 855 F.2d 1277, 1281 (7th Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988).

After filing § 6 notices, the Unions then filed suit in state court, subsequently removed to this court, to enjoin CSXT from altering the status quo until it had bargained with the Unions over the effects of the sale on CSXT's employees. CSXT defended this suit on two grounds: first, that moratorium provisions in the collective bargaining agreements barred suit, *Decker II,* 688 F.Supp. at 102 & n. 4, and second, that the line sale was subject to the exclusive jurisdiction of the Interstate Commerce Commission ("ICC"), thus rendering the RLA inapplicable. *Id.* at 102. This court initially dismissed this suit on the ground that the ICC's jurisdiction preempted the RLA. *Decker I,* 672 F.Supp. 674, *vacated,* 688 F.Supp. 98. This decision was later vacated on motion by the Unions. *Decker II,* 688 F.Supp. at 107–09, *aff'd,* 879 F.2d 990. Before this court could reconsider that question, however, CSXT filed suit in this court seeking a declaratory judgment that it had no statutory obligation to bargain with the Unions prior to the line sale, and an injunction against Union self-help, including strikes. The Unions counterclaimed, again asking that the status quo be maintained and the sale enjoined until the RLA's dispute resolution procedures could be exhausted. *See Decker II,* 688 F.Supp. at 103.[2]

At that stage of the controversy, once this court had concluded that the labor protection provisions of the RLA were not preempted by the Interstate Commerce Act ("ICA"), *Decker II,* 688 F.Supp. at 107–09, *aff'd,* 879 F.2d 990, the main question was whether the line sale and attendant layoffs of union employees on the Buffalo–Eidenau line was a "major" or "minor" dispute un-

---

**1.** For a brief listing of protections that were provided in then-existing agreements, *see Decker II,* 688 F.Supp. at 104 & n. 7.

**2.** While this proceeded, B & P and its parent corporations filed notice with the ICC to exempt the sale from various ICC prior-approval requirements. *See Decker II,* 879 F.2d at 993. These exemptions were granted in late 1987. *See id.*

der the RLA. *Id.* at 109–12, *aff'd,* 879 F.2d at 995–1002.

There are two very different dispute resolution procedures under the RLA. Although the statute does not mention them, the Supreme Court has labelled them "major" and "minor."

The first ["major"] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class ["minor"], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). *See also Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302–07, 109 S.Ct. 2477, 2479–83, 105 L.Ed.2d 250 (1989). "[M]ajor disputes seek to create contractual rights, minor disputes to enforce them." *Id.* at 302, 109 S.Ct. at 2480. Major disputes are governed by § 2, Seventh, and § 6 of the RLA and require extensive negotiation and mediation. *Id. See also Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969) (explaining steps for resolution of major dispute). The parties may not resort to the use of economic force unless these extensive procedures conclude without agreement. *Consolidated Rail,* 491 U.S. at 303, 109 S.Ct. at 2480. Minor

disputes are governed by § 2, Sixth, and § 3, First(i), of the RLA, which compels binding arbitration between the parties. *Id.*

The Unions argued this dispute was major because they were seeking, by filing § 6 notices, to add new labor-protective provisions to their collective bargaining agreements with CSXT. CSXT argued the dispute was minor because, rather than requiring new collective bargaining terms, the line sale and attendant layoffs of union members was permitted by the existing agreements. CSXT was not required to *prove* this contractual defense argument. *Id.* at 307, 109 S.Ct. at 2482–83; *Decker II,* 879 F.2d at 997–98. This question would be settled by arbitration. *Consolidated Rail,* 491 U.S. at 303, 109 S.Ct. at 2480. CSXT needed only to show that its alleged contractual justification for selling the line without bargaining was not "obviously insubstantial." *Id.* at 306–07, 109 S.Ct. at 2482–83; *Decker II,* 879 F.2d at 997. Absent even a plausible contractual justification for selling the line without prior effects bargaining with the Unions, the dispute would have been "major," and could not have gone forward until such effects bargaining was complete. *Consolidated Rail,* 491 U.S. at 302–03, 307, 109 S.Ct. at 2479–80, 2482–83; *Decker II,* 879 F.2d at 1003 n. 9; *General Comm. of Adjustment, United Transp. Union v. CSX R.R.,* 893 F.2d 584, 591 (3d Cir.1990).

This court held that the dispute between the Unions and CSXT was "minor" because

a *plausible* interpretation of the collective bargaining agreements in effect between CSXT and the defendant unions would provide a substantial contractual justification for the sale of the Buffalo–Eidenau line without additional bargaining.

*Decker II,* 688 F.Supp. at 112 (emphasis added). The court based its conclusion on an evaluation of reduction-in-force ("RIF") clauses in CSXT's collective bargaining agreements[3] and past practices of CSXT

---

**3.** A typical RIF clause provides, in relevant part:

(a) When it becomes necessary to reduce expenses, the forces at any point or in any department or subdivision thereof shall be

with respect to line sales. *Decker II*, 688 F.Supp. at 110–12.[4] Accordingly, the dispute was subject to binding arbitration before the National Railroad Adjustment Board, pursuant to RLA § 3, First, 45 U.S.C. § 153, First, or a special adjustment board established by the parties pursuant to RLA § 3, Second, 45 U.S.C. § 153, Second. *Decker II*, 688 F.Supp. at 112.

It must be stressed that this holding was based on the carrier's contractual *defense* to the Unions' efforts to preserve the status quo through § 6's major dispute resolution procedures. CSXT was the party seeking arbitration, not the Unions. *Id.* at 109. As such, the burden to show this was a minor dispute, although slight, was on the carrier. *Consolidated Rail*, 491 U.S. at 307, 109 S.Ct. at 2482–83; *Decker II*, 879 F.2d at 999. This burden remained with the carrier during arbitration. *Id.* at 1003. *See infra* Part I(B).

Upon holding the dispute to be minor, this court then filed an order enjoining the Unions from engaging in strikes or other activity to prevent the line sale. The order also required CSXT to bargain with the Unions over the effects of the sale pursuant to the Unions' § 6 notices, 45 U.S.C. § 156, and permitted the line sale to proceed, subject to a stay during application for appeal. *See Decker II*, 879 F.2d at 994.

The decision and order were appealed by the Unions to the Second Circuit, which stayed the sale pending expedited review. *Id.* at 994–95. After oral argument the court lifted the stay on July 18, 1988, and the line was sold to B & P on July 19, 1988.

While the appeal to the Second Circuit was pending, on July 15, 1988, CSXT and the Unions agreed to the establishment of a special adjustment board ("Board"), to which they submitted their dispute pursuant to RLA § 3, Second, 45 U.S.C. § 153, Second. On December 15, 1988, the Board concluded that neither the language of any collective bargaining agreement between the parties, nor past practice, contractually authorized a sale of the Buffalo–Eidenau line by CSXT without bargaining over the effects of the sale on employees working on that line. *Decker II*, 879 F.2d at 995.

Upon issuance of the arbitration decision, CSXT and the Unions took divergent paths. The Unions moved the Second Circuit, which as of that time had not issued an opinion, to vacate this court's decision "'[s]ince there is no longer a basis for concluding that appellee [CSXT] has a contractual right to abolish jobs without first bargaining.'" *Id.* CSXT, on the other hand, initiated suit in this court challenging the findings of the Board on the ground that it exceeded its jurisdiction. *CSX Transp., Inc. v. United Transp. Union*, CIV-88–1404C ("*CSXT*").

The Second Circuit then issued its opinion, on June 7, 1989, agreeing with this court's decision in *Decker II*. *Decker II*, 879 F.2d at 1002. CSXT's proposed contractual defense was "plausible," and not "obviously insubstantial," and thus the dispute was minor. *Decker II*, 879 F.2d at 999. In reaching this conclusion, the court relied primarily on its interpretation of RIF provisions in CSXT's collective bargaining agreements, rather than CSXT's past practice during line sales. *Id.* at 1000.

As part of its decision, the Second Circuit went on to discuss the effect of the arbitration award. The court denied the Unions' motion to vacate this court's prior decision, noting that there was no conflict between this court's determination that CSXT had a "plausible" contractual defense and the Board's determination that CSXT's "position, although 'arguable' and 'plausible,'

reduced, seniority to govern; and employees affected to take the rate of the job to which they are assigned.

(b)(1) Five working days' advance notice will be given to employees affected before the abolishment of positions or reduction in force, and list of employees affected will be furnished to the local committee....

*Decker II*, 688 F.Supp. at 110.

**4.** A carrier's contractual defense is not limited by explicit provisions in collective bargaining agreements. It may also rely on "those actual, objective working conditions out of which the dispute arose...." *Shore Line*, 396 U.S. at 153, 90 S.Ct. at 301. For past practices to be considered "actual, objective working conditions," however, they must have occurred for some time with the "knowledge and acquiescence of the employees." *Id.* at 154, 90 S.Ct. at 301.

was, on careful analysis, unavailing." *Id.* at 1003 & n. 9.

After the Second Circuit's rejection of the Unions' motion, the Unions filed suit in this court, *American Train Dispatchers Ass'n v. CSX Transp., Inc.*, CIV–90–481C ("*ATDA* "), asking the court to remand the original dispute to the Board to fashion a remedy in line with its decision. *ATDA*, Item 1. The Board's "award" stated only that: "The questions set before the Board are disposed of as provided in the Findings and Conclusions herein." *CSXT*, Item 1, Exh. C at 26; *Decker II*, 879 F.2d at 1002. Currently pending is the Unions' motion to amend their answer in *CSXT* to seek this same relief as a counterclaim to CSXT's 1988 suit. *CSXT*, Item 30. CSXT has moved to strike this suit and amended answer, arguing that the Unions should have asserted this claim as a compulsory counterclaim to its 1988 suit. *See ATDA*, Item 14 at 7–13.

Thus, the controversy as it now stands before this court is as follows:

1) Did the Board exceed its jurisdiction in holding that CSXT's contractual defense arguments, although plausible, were ultimately unpersuasive?

2) If the Board did not exceed its jurisdiction, should the Unions be nonetheless barred from bringing their action asking this court to fashion an order out of the Board's decision because the Unions should have brought this action as a compulsory counterclaim to CSXT's 1988 suit?

3) If the Unions are not so barred, what order should this court frame out of the Board's decision?

### DISCUSSION

I. *DID THE BOARD EXCEED ITS JURISDICTION?*

The first issue to be considered is whether the Board exceeded its jurisdiction in rendering its decision of December 15, 1988. *See CSXT*, Item 1, Exh. C (Special Board of Adjustment No. 1018 decision) (hereinafter "Award").

Before proceeding further, it must be noted that the jurisdiction of this court to review arbitration decisions under the RLA is limited.

The court shall have jurisdiction to affirm the order of the [Board] or to set it aside, in whole or in part, or it may remand the proceeding to the [Board] for such further action as it may direct. On such review, *the findings and order of the [Board] shall be conclusive on the parties*, except that the order of the [Board] may be set aside, in whole or in part, or remanded to the [Board], [1] for failure of the [Board] to comply with the requirements of this chapter, [2] *for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction*, or [3] for fraud or corruption by a member of the [Board] making the order.

45 U.S.C. § 153, First (q) (emphasis added). *See Consolidated Rail*, 491 U.S. at 304, 109 S.Ct. at 2481; *Decker II*, 879 F.2d at 1003.

CSXT argues that the Board exceeded its jurisdiction in four ways. First, it formulated and decided an issue not put before it. Second, the Board's conclusion that CSXT's contractual defense was unavailing was based, not on CSXT's agreements or past practices, but on the Board's interpretation of the Unions' *statutory* rights under the RLA. Third, the Board's award was not based on the terms of collective bargaining agreements between the parties. Fourth, the Board attempted to rewrite the parties' agreements by effectively writing a limitation into them that RIF provisions do not apply to job abolishments which result from line sales. *CSXT*, Item 15 at 3–4, 22–23.

A. *Did the Board Decide an Issue Not Put Before It?*

CSXT argues first that the Board framed and decided an issue not put before it by either party.

The Board was established pursuant to RLA § 3, Second, 45 U.S.C. § 153, Second, by a Memorandum of Agreement dated July 15, 1988, between CSXT and the Un-

ions. *CSXT,* Item 1, Exh. A. The parties agreed that

> This Board will have authority to the same extent that the National Railroad Adjustment Board ["NRAB"] would have had authority to hear and decide issues submitted by the Carrier [CSXT] and the Organizations [Unions] arising from the sale by the carrier of its line of railroad between Buffalo, New York and Eidenau, Pennsylvania.

*CSXT,* Item 1, Exh. A, ¶ 1. The parties also agreed to "furnish each other the issues they will submit to the Board," *id.,* ¶ 15, and that "[u]pon the execution of this agreement, the submissions by the Carrier to the National Railroad Adjustment Board ["NRAB"] will be deemed withdrawn and submitted to the Special Board established by this agreement." *Id.,* ¶ 14.[5]

Both parties submitted issues to the Board. CSXT submitted three issues to the Board, only the first of which concerns us here.

> 1. Have the Organizations sustained their burden of proof that the Carrier does not have the *unilateral right,* under its existing collective bargaining agreements and past practices, to dispose of its rail lines between Buffalo, New York and Eidenau, Pennsylvania?

Award at 2 (emphasis added). The Unions submitted seven issues for Board resolution, none of which is directly at issue here. Award at 3. CSXT framed its first issue close to, but not identical with, the way it identified the issue before the NRAB prior to its agreement to submit to expedited arbitration under RLA § 3, Second, 45 U.S.C. § 153, Second. CSXT framed that question as follows: "Does the Carrier have the *unilateral right* to dispose of property without bargaining under the existing Agreement and past practice?" *CSXT,* Item 5–A, Exh. A (emphasis added).

This court identified the issue very similarly in its decision of May 26, 1988.

> The dispute between CSXT and its employees, in very basic terms, comes down to whether the carrier has the unilateral right to sell one of its less profitable line operations, and thereby abolish all CSXT positions on that line, without bargaining with the unions about protections for its employees who will be affected by that sale.

*Decker II,* 688 F.Supp. at 110.[6]

In seeking to formulate the issues before it, the Board tried to reconcile the parties' "disparate approaches to the dispute," Award at 2, and also looked to this court's opinion in *Decker II,* which the Board noted formed "the genesis of its jurisdiction." *Id.* at 4. Drawing these different formulations together, the Board concluded that three issues, only the first of which is in dispute here, *see CSXT,* Item 14 at 15, fairly encompassed the dispute:

> 1. Did the Carrier have the unilateral right, under existing collective bargaining provisions or past practice, to abolish its positions in connection with the sale of the Buffalo–Eidenau Line without first negotiating with the Organizations as to the affected employees?

Award at 5.

Plaintiff CSXT correctly asserts that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)). And, further, that "[w]hile an arbitrator has broad power to fashion remedies on issues the parties

---

**5.** Prior to its agreement to submit the dispute to the special adjustment board, CSXT initially approached the NRAB to arbitrate the dispute. *CSXT* Item 5–A, Exh. A.

**6.** This court did not define the issue to be decided by the Board, although it could have. *Chicago & Northwestern Transp. Co. v. RLEA,* 855 F.2d at 1286 (district courts may "determine the

proper classification of a dispute under the RLA scheme...."). *But cf. Chicago & Northwestern Transp. Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144, 158 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991) ("there is a considerable question, though again one not necessary to decide, concerning the district court's power to order arbitration.").

have empowered him to resolve, ... he lacks authority to decide questions the parties have not agreed to submit to him." *Courier–Citizen Co. v. Boston Electrotypers Union No. 11,* 702 F.2d 273, 281 (1st Cir.1983). *See also International Chem. Workers Union, Local No. 566 v. Mobay Chem. Corp.,* 755 F.2d 1107, 1110 (4th Cir. 1985) ("The parties, not the arbitrator, must define the issues. The submission is 'the source and limit' of the arbitrator's power."); *Frederick Meiswinkel, Inc. v. Laborer's Union Local 261,* 744 F.2d 1374, 1377 (9th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1394, 84 L.Ed.2d 783 (1985).

Nevertheless, "the presumption of authority that attaches to an arbitrator's award applies with equal force to his decision that his award is within the submission." *Johnston Boiler Co. v. Local Lodge No. 893,* 753 F.2d 40, 43 (6th Cir.1985). *See also Vic Wertz Distrib. Co. v. Teamsters Local 1038,* 898 F.2d 1136, 1139 (6th Cir. 1990). Courts should defer to an arbitrator's interpretation of a submission, the Third Circuit has argued, for three reasons, the first and third of which support deference here. *Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299, 302 (3d Cir.1982). First, "plenary judicial review of arbitration submissions undermines the congressional policy in favor of expeditious and relatively inexpensive means of settling grievances, and thus of promoting labor peace." *Id.*[7] Third, judicial deference lessens the burden on courts to determine the exact scope of arbitration submissions. *Id.* Other courts have also supported this policy. *See, e.g., In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988); *Kurt Orban Co. v. Angeles Metal Systems,* 573 F.2d 739, 740 (2d Cir.1978); *Mobil Oil Corp.,* 679 F.2d at 302 n. 1 (listing cases); *International Ass'n of Machinists & Aerospace Workers, Dist. 776 v.*

*Texas Steel Co.,* 639 F.2d 279, 283 (5th Cir.1981).[8]

Given these standards, the court concludes that the Board in this case did not exceed its jurisdiction in framing the issue as cited above. The question put before the Board by CSXT, in its simplest phrasing, was whether CSXT had the *unilateral right,* under existing agreements and past practices, to dispose of its rail lines. *Compare* Award at 2 (CSXT submission to Board) *with CSXT,* Item 5–A, Exh. A (CSXT submission to NRAB). This question necessarily includes an inquiry into whether CSXT had the unilateral right to abolish positions on those lines. *See* Award at 5 (Board statement of issue). CSXT argues extensively, though, that the Board's addition of the phrase "without first negotiating" to CSXT's characterization of the issue exceeded its authority. *See id.* The court finds, however, that there is no essential difference between the Board's and CSXT's phrasings of the question. The Unions did not challenge CSXT's right, under its then-existing collective bargaining agreements, to dispose of its rail lines. *Decker II,* 688 F.Supp. at 109. Were this the only question CSXT sought to arbitrate, there would have been no need to arbitrate. The issue CSXT put before the Board would have been meaningless.

■ What the Unions did challenge in this court was CSXT's right to dispose of its rail lines *without bargaining* over the effects of that sale on Union members once the Unions had filed § 6 notices to bargain. *Decker II,* 688 F.Supp. at 102. CSXT was granted its request to arbitrate this question, however, because it had a plausible argument that this question could be settled by interpretation of its contracts with the Unions. *Id.* at 112. In other words, CSXT was permitted to arbitrate the question whether it had the right, by contract,

**7.** The court's second reason, that a court's decision not to defer to an arbitrator's understanding of the submission would at times be inconsistent with deference to the arbitrator's interpretation of the agreement, *Mobil Oil,* 679 F.2d at 302, is less relevant here because this case does not involve the interpretation of a pre-existing clause to arbitrate.

**8.** The provision of the RLA under which this Board was established itself states: "The members of the board so designated shall determine all matters not previously agreed upon by the carrier and the representative of the employees with respect to the establishment *and jurisdiction* of the board." RLA § 3, Second, 45 U.S.C. § 153, Second (emphasis added).

to dispose of its lines without bargaining. *Id.* at 110. Despite CSXT's arguments to the contrary, this is simply the same question CSXT put before the Board: whether CSXT had the *unilateral right*—a right independent of any bargaining rights the Unions might have—under contract, to dispose of its lines. *See supra.* The language of arbitration demands should not be read so narrowly as to defeat an arbitration award on semantic differences in the phrasing of an issue. *Kurt Orban,* 573 F.2d at 740; *Mobil Oil Corp.,* 679 F.2d at 303; *International Ass'n of Machinists,* 639 F.2d at 283.

Accordingly, the Board did not exceed its jurisdiction in its characterization of the issues submitted to it.

B. *Did the Board Improperly Base Its Award on an Interpretation of the Parties' Statutory Rights?*

CSXT argues, second, that the Board's conclusion that CSXT's contractual defense was unavailing was based, not on CSXT's agreements or past practices, but on the Board's interpretation of the Unions' *statutory* rights under the RLA.

■ It is manifest that an arbitrator may not base an award on an interpretation of statutory rights. The arbitrator's role was explained in detail by the Supreme Court in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 53–54, 94 S.Ct. 1011, 1022, 39 L.Ed.2d 147 (1974).

As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the "industrial common law of the shop" and the various needs and desires of the parties. The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties:

"[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

If an arbitral decision is based "solely upon the arbitrator's view of the requirements of enacted legislation," rather than on an interpretation of the collective-bargaining agreement, the arbitrator has "exceeded the scope of the submission," and the award will not be enforced. *Ibid.* Thus the arbitrator has authority to resolve only questions of contractual rights....

*See also McDonald v. City of West Branch,* 466 U.S. 284, 290–91, 104 S.Ct. 1799, 1803–04, 80 L.Ed.2d 302 (1984); *Barrentine v. Arkansas–Best Freight System,* 450 U.S. 728, 744, 101 S.Ct. 1437, 1446–47, 67 L.Ed.2d 641 (1981); *Roadmaster Corp. v. Production & Maintenance Employees' Local 504,* 851 F.2d 886, 889 (7th Cir.1988). Further, at least one arbitration board's decision has been struck down for interpreting contract language in light of its view of the requirements of the RLA. *International Ass'n of Machinists & Aerospace Workers v. Alaska Airlines, Inc.,* 1988 WL 235478 (W.D.Wash. Aug. 9, 1988).

■ Plaintiff devotes portions of no less than five briefs arguing that the Board improperly based its award on statutory interpretation. *CSXT,* Item 15 at 28–37, Item 25 at 6–17, Item 26 at 1–6, Item 28 at 6–12, Item 29 at 1–4. The essence, however, of plaintiff's argument can be found in its first brief. *CSXT,* Item 15 at 29–32. Plaintiff argues that it placed before the Board four categories of evidence to prove it was entitled by contract to sell the Buffalo–Eidenau line without bargaining:

(1) the express language in the force reduction provisions; (2) the bargaining history of those provisions; (3) CSXT's past practice of applying those provisions to the abolishment of jobs, including abolishments resulting from nine prior

line sales; and (4) the many arbitration precedents holding that a carrier has the management right to abolish unneeded positions in the absence of limitations on that right contained in collective bargaining agreements.

*Id.* at 29.

Despite this evidence, and despite the fact that the Board did not disagree with this evidence, the Board found it "not dispositive" of the issue before it. Award at 17. Instead, plaintiff argues, the Board found dispositive the *statutory* rights of the Unions and the fact that the Unions had not *waived* these rights in their collective bargaining agreements or during past line sales. In support of this argument, plaintiff quotes extensively from the Board's opinion. *See CSXT,* Item 15 at 30–31. One of the Board's conclusions encapsulates plaintiff's point. The Board concluded:

> Thus, it is clear that there is nothing in these agreements which prohibits the sale of the Carrier's assets; the Carrier is free to do so, and the Organizations do not disagree. It is equally clear, however, that there is nothing in these agreements that *waives the right of the Organizations to invoke their statutory rights to bargain over the effects of such sale on the employees they represent.*

Award at 18 (emphasis added). Thus, the Board, plaintiff argues, based its decision denying CSXT's contractual defense " 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement...." *Gardner–Denver,* 415 U.S. at 53, 94 S.Ct. at 1022 (quoting *Enterprise Wheel & Car Corp.,* 363 U.S. at 597, 80 S.Ct. at 1361).

Plaintiff's arguments are unavailing. To arrive at this conclusion, we must look at the Board's decision in the procedural context of this case. It is important to note that the first thing the Board determined, before it even reviewed CSXT's or the Unions' arguments, was that *CSXT had the burden* to demonstrate that its contractual arguments—embodied in existing collective

bargaining agreements or past practices— justified its unilateral right to abolish positions on its Buffalo–Eidenau line. Award at 4. The Board based this conclusion on its interpretation of the procedural posture of the issue before it. *See supra* Part I(A).

■ CSXT was the party seeking arbitration. *Decker II,* 688 F.Supp. at 109. It sought arbitration as an affirmative defense to the Unions' efforts to maintain the status quo through the filing of § 6 notices. *Id.* It therefore carried the burden to establish this defense. *Consolidated Rail,* 491 U.S. at 307, 109 S.Ct. at 2482–83; *Decker II,* 879 F.2d at 999; *Chicago & Northwestern Transp. Co. v. RLEA,* 855 F.2d at 1283. Accordingly, it was appropriate for the Board to require CSXT to carry this burden during arbitration. *See Decker II,* 879 F.2d at 1003 & n. 9.

In this context, the Board was quite clear in the beginning of its opinion that it did not base its conclusions upon an interpretation of statutory rights.

> It must be emphasized at the outset that this Board does not include any determination of the nature or extent of the [Unions'] asserted statutory right, *if any,* to bargain; that determination is properly before the courts. The Board's inquiry is limited to a determination of whether the parties' written agreements or past practices (as alleged by the Carrier) entitled the Carrier, as it claims, unilaterally to abolish these positions in connection with the sale of one of its lines.

Award at 15–16 (emphasis added).

■ The difficulty in this case is that there are issues of statutory interpretation and of contractual interpretation, and the two seem inextricably intertwined. The issue of statutory interpretation was presented by the Unions in *Decker II:* Do the Unions have the right under the RLA to pre-line sale bargaining? Or, to restate this issue, do the Unions have the right to delay the sale of a line under the status quo provisions of § 6 once they have filed notice of "an intended change in agreements affecting rates of pay, rules, or working conditions," RLA § 6, 45 U.S.C. § 156, i.e., is it a "major" dispute? This

court answered *no*. *Decker II*, 688 F.Supp. at 112, *aff'd*, 879 F.2d at 1002. This same conclusion has been reached by other courts. *See, e.g., General Comm. of Adjustment v. CSX R.R.*, 893 F.2d at 589–93; *Chicago & Northwestern Transp. Co. v. RLEA*, 855 F.2d at 1283–86. *See also Decker II*, 879 F.2d at 1001–02 (discussing analogous cases). This conclusion is always based, however, on the railroad's "plausible" contractual defense. Courts are not allowed to inquire whether that defense is in fact meritorious. *Id.* at 1003; *Maine Cent. R.R. v. United Transp. Union*, 787 F.2d 780, 782 (1st Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Local 553, Transport Workers v. Eastern Air Lines*, 695 F.2d 668, 675 (2d Cir.1982). The interpretation of contracts is left in the hands of arbitration boards. *Decker II*, 879 F.2d at 1003.

The contractual interpretation issue, on the other hand, asks: Does the carrier have a contractual defense to the Unions' "asserted statutory rights, *if any*, to bargain"? Award at 16 (emphasis added). In other words, have the Unions in their collective bargaining agreements *waived* their statutory rights, whatever those might be? This is the issue the Board decided in the negative. Award at 17, 20. It assumed, *without deciding*, that the Unions had statutory rights to bargain over the effects of a line sale and, looking solely at the collective bargaining agreements and past practices, asked whether such rights—whether or not they existed—had been waived. *See* Award at 15–20. Contrary to what plaintiff argues, this conclusion is not dependent on an interpretation of any statute. The Board only decided that the parties, when they drew up their labor contracts, did not intend that the agreements' RIF provisions would apply to line sales. Award at 17. CSXT's Assistant Vice President Brenton Massie admitted as much before the Board. *Id.* Similarly, the Board decided that CSXT's past practices of selling or abandoning lines without objection by the Unions had not attained contractual status. Award at 18–20. Because CSXT carried the burden of establishing its contractual defense, *see supra*, it was entirely appro-

priate for the Board to base these conclusions on the absence of evidence to the contrary. Award at 17–18, 20. This court cannot disturb these conclusions. RLA § 3, First (q), 45 U.S.C. § 153, First (q); *Decker II*, 879 F.2d at 1003.

These conclusions must be divorced, however, from the *statutory* question, now before this court and discussed below, which arises from them. That question asks what statutory rights the Unions have in light of the failure of CSXT's contractual defense. *See infra* Part III.

Accordingly, the Board interpreted contractual as opposed to statutory rights and thus did not exceed its jurisdiction.

## C. *Did the Board Improperly Rewrite the Parties' Agreements?*

Plaintiff also argues that the Board's award improperly attempted to rewrite the parties' agreements. *CSXT*, Item 15 at 38–40.

 Plaintiff correctly asserts that an arbitration board exceeds the scope of its authority when it modifies, rewrites, or holds contrary to "clear and unambiguous" contractual language. *Miller v. Chicago & North Western Transp. Co.*, 647 F.Supp. 1432, 1439 (N.D.Ill.1986). *See also United Food & Commercial Workers Union, Local 1119 v. United Markets, Inc.*, 784 F.2d 1413, 1415–16 (9th Cir.1986) (arbitrator erred in misinterpreting clear phrase "no longer"); *Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.2d 176, 177 (9th Cir.1983) (arbitrator ignored plain import of contract); *Baltimore & Ohio R.R. v. Brotherhood of Ry., Airline & Steamship Clerks*, 813 F.2d 1227, 108 (CCH) Lab.Cas. ¶ 10,261 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 705, 98 L.Ed.2d 656 (1988) ("Even a cursory reading of the relevant sections of the [contract] would lead the reader to believe that those practices which [the union] now challenges are completely proper under the collective bargaining agreement."). These cases, however, fail to establish the essential predicate to plaintiff's argument: namely, that the collective bargaining provisions at issue here were clear *as applied*

*to line sales.* Nothing in the RIF provisions cited by plaintiff, *see supra* note 3, indicates whether the parties intended these provisions to apply to line sales. The Board's conclusion that the parties did not intend them to apply cannot be second-guessed by this court. RLA § 3, First (q), 45 U.S.C. § 153, First (q).

Accordingly, the Board did not exceed its jurisdiction in rendering its award.

## II. *SHOULD THE UNIONS BE PERMITTED TO AMEND THEIR COMPLAINT?*

█ Plaintiff alternately argues that defendant Unions were required to assert the claims they brought in *ATDA,* CIV–90–481C, and which they now seek to add as counterclaims in *CSXT,* CIV–88–1404C, under an amended answer currently pending before this court, *CSXT,* Item 30, as compulsory counterclaims to plaintiff's 1988 suit, and should thus be barred. Fed.R. Civ.P. 13(a); *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974) ("A counterclaim which is compulsory but is not brought is thereafter barred."). Plaintiff argues that claims to enforce arbitration awards are compulsory counterclaims to suits challenging such awards. *E.g., Burlington Northern, Inc. v. American Ry. Supervisors Ass'n,* 527 F.2d 216, 223 (7th Cir.1975); *White Motor Corp. v. UAW,* 365 F.Supp. 314, 317 (S.D.N.Y.1973), *aff'd,* 491 F.2d 189 (2d Cir.1974). It argues further that the Unions' claim to enforce this arbitration award and CSXT's challenge to that award clearly arise from the same "transaction or occurrence." Fed.R.Civ.P. 13(a). Indeed, this appears to be the case under the logical relationship test. *See Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 893 F.2d 26, 29 (2d Cir.1990); *Harris v. Steinem,* 571 F.2d 119, 123 (2d Cir.1978).

The Unions, however, ask this court to permit the counterclaims, although compulsory, because "justice requires" it. Fed.R. Civ.P. 13(f). Rule 13(f) should be read in conjunction with Fed.R.Civ.P. 15(a), which permits a party to amend its pleading after 20 days by leave of court, "and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). *See Northwestern Nat'l Ins. Co. of Milwaukee v. Alberts,* 717 F.Supp. 148, 153 (S.D.N.Y.1989). *See also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (leave should be "freely given" under Rule 15(a)); *Richardson Greenshields Sec. v. Lau,* 113 F.R.D. 608, 610 (S.D.N.Y.1986). The court in *Northwestern Nat'l Ins. Co.* listed several criteria:

> In assessing whether to grant a defendant leave to amend its answer to add a counterclaim, a court should consider whether the counterclaim is compulsory, whether the pleader has acted in good faith and has not unduly delayed filing the counterclaim, whether undue prejudice would result to the plaintiff, or whether the counterclaim raises meritorious claims.

*Northwestern Nat'l Ins. Co.,* 717 F.Supp. at 153.

The court feels that under these criteria the Unions should be permitted to assert their counterclaim at this point, both because they would be unduly prejudiced and because their counterclaim is at least arguably meritorious. *See* 6 C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 1430 (1990).

Accordingly, defendant Unions' motion to amend their answer, *CSXT,* Item 30, is hereby granted. As the claims brought by the Unions in *ATDA,* CIV–90–481C, are now merged into *CSXT,* CIV–88–1404C, the former suit is hereby dismissed.

## III. *WHAT ORDER SHOULD THIS COURT FRAME OUT OF THE BOARD'S DECISION?*

Defendant Unions now seek an order from this court remanding the dispute to the Board to award appropriate relief. *ATDA,* Item 1. As noted previously, the Board's first award did not order any relief. Award at 26; *Decker II,* 879 F.2d at 1002. This court is fully empowered to grant the Unions' motion under RLA § 3, First (q), 45 U.S.C. § 153, First (q).

> If any employee or group of employees ... is aggrieved by ... the failure of the

[Board] to include certain terms in [its] award, then such employee or group of employees ... may file in any United States district court.... The court shall have jurisdiction to affirm the order of the [Board] or to set it aside, in whole or in part, or it may remand the proceeding to the [Board] for such further action as it may direct.

*Id. See also Decker II,* 879 F.2d at 1005. Further, several courts have held that the Board is fully able to award appropriate relief once "the Board determines that the employer's conduct was not justified by the contract...." *Consolidated Rail,* 491 U.S. at 310 n. 8, 109 S.Ct. at 2483 n. 8. *See Order of Ry. Conductors v. Pitney,* 326 U.S. 561, 566, 66 S.Ct. 322, 324–25, 90 L.Ed. 318 (1946); *Decker II,* 879 F.2d at 1005; *Chicago & Northwestern Transp. Co. v. RLEA,* 855 F.2d at 1288. The latter court noted, in language quoted in *Decker II,* that

> If the NRAB rejects [the carrier's] interpretation of the collective bargaining agreements and determines that the employees who are displaced by the challenged rail line sale are entitled to relief, it will be able to order the necessary payment of monies and adjustments in seniority levels it deems necessary to make these employees whole. Thus, it cannot be inferred that the legal remedy available to the RLEA unions in this case (via the NRAB arbitration procedure) is inadequate.

*Id.; Decker II,* 879 F.2d at 1005. *See also id.* at 997 ("The NRAB has broad authority in minor disputes to grant relief and make employees whole if the unions ultimately prevail before the Board.").

The Unions have won before the Board. "The Board ... determined that CSX's position, although 'arguable' and 'plausible,' was, on careful analysis, unavailing." *Decker II,* 879 F.2d at 1003. These findings cannot be challenged by this court. RLA § 3, First (q), 45 U.S.C. § 153, First (q). As such, it might seem a simple matter to remand this case to the Board with an order to make CSXT's former employees whole in line with the decisions cited above. We must pause, however, because although

the Board determined that CSXT did not have a contractual defense to the Unions' "asserted statutory right, *if any,* to bargain" prior to the line sale, Award at 16 (emphasis added), the Board did not, and could not, determine whether such statutory rights existed. This court must make that determination. In light of several cases that have been decided since *Decker II,* it appears that those statutory rights may be limited. *See Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) ("*P & LE*"); *Chicago & Northwestern Transp. Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144 (7th Cir.1990) ("*C & NW—7th Cir.*"); *Railway Labor Executives' Ass'n v. Chicago & Northwestern Transp. Co.,* 890 F.2d 1024 (8th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990) ("*C & NW—8th Cir.*"); *Southern Pacific Transp. Co. v. International Bhd. of Locomotive Eng'rs,* 752 F.Supp. 400, 408–09 (D.Kan.1990).

Before launching into an analysis of those cases, however, we must first understand upon what grounds a Union remedy would be based. As was discussed in the Background section of this opinion, either the Unions or the carrier can, by filing a § 6 notice, seek "an intended change in agreements [between the parties] affecting rates of pay, rules, or working conditions...." RLA § 6, 45 U.S.C. § 156. This section then triggers an elaborate process of negotiation and mediation between the parties in an effort to come to agreement on the proposed change. *Burlington Northern R.R.,* 481 U.S. at 444, 107 S.Ct. at 1850–51; *Shore Line,* 396 U.S. at 148–49 & n. 14, 90 S.Ct. at 298–99 & n. 14; *Jacksonville Terminal Co.,* 394 U.S. at 378, 89 S.Ct. at 1115. Once this § 6 notice has been given, "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon...." RLA § 6, 45 U.S.C. § 156. *See P & LE,* 491 U.S. at 504, 109 S.Ct. at 2593. As the Court stated in *Shore Line,* § 6 "imposed upon the parties an obligation to make every reasonable ef-

fort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies were being exhausted." *Shore Line,* 396 U.S. at 149, 90 S.Ct. at 298.

The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.

*Id.* at 152–53, 90 S.Ct. at 301.

■ The Unions in this case filed § 6 notices to force CSXT to preserve the status quo until effects bargaining over the line sale could be completed. *Decker II,* 688 F.Supp. at 102. This notice was ineffective in preserving the status quo, but only because CSXT raised a plausible argument that selling the Buffalo–Eidenau line, and thereby terminating its positions on that line, was justified under its contracts with the Unions. *Id.* at 109–112, *aff'd,* 879 F.2d at 998–1002, 1003 n. 9. That "plausible" argument has now lost. *See supra.* CSXT's loss of that argument, however, does not make this a major dispute. *Decker II,* 879 F.2d at 1004. Nor does it prevent the line sale, which has long since been completed. *See id.* at 995. Nevertheless, the failure of CSXT's contractual justification *does* entitle the Unions to a remedy, based on the idea that the Unions would have been entitled to preserve the status quo during bargaining *but for* that argument. This, the court takes it, is the basis on which courts would permit the Board to make union members whole, i.e., put them in the position they would have been in had they been entitled to maintain the status quo under § 6. *See Consolidated Rail,* 491 U.S. at 310 n. 8, 109 S.Ct. at 2483 n. 8; *Decker II,* 879 F.2d at 1005; *Chicago & Northwestern Transp. Co. v. RLEA,* 855 F.2d at 1288. *See also* Comment, *Enjoining Strikes and Maintaining the Status Quo in Railway Labor Dis-*putes, 60 Colum.L.Rev. 381, 393–94 (1960) (discussing possible remedies should the unions prevail in arbitration). This remedy may not actually make union members whole, given the delay and the irreversible sale of the Buffalo–Eidenau line, but it appears to be all that the Unions may be entitled to. *See Consolidated Rail,* 491 U.S. at 310 n. 8, 109 S.Ct. at 2483 n. 8; *Brotherhood of Locomotive Eng'rs v. Missouri–Kansas–Texas R.R.,* 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960); Comment, *supra,* 60 Colum.L.Rev. at 394–95.[9]

■ What has been called into question by the cases decided since *Decker II,* however, is whether preservation by CSXT of the jobs on the Buffalo–Eidenau line would have been part of the status quo which must have been maintained had the Unions' § 6 notices been effective. In *P & LE,* the Supreme Court held that

the decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment forbidden by the status quo provision of § 156.

*P & LE,* 491 U.S. at 509, 109 S.Ct. at 2596. The Court reasoned that

[T]he decision to close down a business entirely is so much a management prerogative that only an unmistakable expression of congressional intent will suffice to require the employer to postpone a sale of its assets pending the fulfillment of any duty it may have to bargain over the subject matter of union notices such as were served in this case.

*Id.* Thus, in a case where a carrier decided to leave the railroad business entirely, the preservation of jobs during effects bargaining was held not to be part of the status quo requirement of § 6.

This holding was based, by analogy, on *Textile Workers Union v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), a National Labor Relations Act

---

**9.** The court is not hereby awarding a remedy to the Unions. This decision will be up to the Board on remand.

("NLRA") case, which held that going out of business entirely, even if motivated by anti-union animus, was not an unfair labor practice under the NLRA. *See P & LE*, 491 U.S. at 507–09, 109 S.Ct. at 2594–96. In *Darlington*, the Court reasoned that the

> proposition that a single businessman cannot choose to go out of business if he wants to would represent such a startling innovation that it should not be entertained without the clearest manifestation of legislative intent or unequivocal judicial precedent so construing the Labor Relations Act.

*Darlington*, 380 U.S. at 270, 85 S.Ct. at 999; *P & LE*, 491 U.S. at 507–08, 109 S.Ct. at 2594–95. This reasoning, however, was expressly confined by the Court to a situation where an employer was quitting the business completely. The Court "disagree[d] with the Court of Appeals that such right includes the ability to close *part* of a business no matter what the reason." *Darlington*, 380 U.S. at 268, 85 S.Ct. at 998 (emphasis added). Partial closings might be motivated by a desire to obtain future benefits from employees, the Court held, *id.* at 271–75, 85 S.Ct. at 1000–02, "[b]ut a complete liquidation of a business yields no such future benefit for the employer, if the termination is bona fide." *Id.* at 272, 85 S.Ct. at 1000.[10] This distinction was reaffirmed in *P & LE*. *P & LE*, 491 U.S. at 507 n. 16, 109 S.Ct. at 2595 n. 16 (noting that "a partial liquidation might present a different case").

Since *P & LE* was handed down, both the Seventh and Eighth Circuits have extended the Court's holding from situations where a railroad employer has chosen to get out of the railroad business entirely to those instances where the railroad has merely decided to sell an unprofitable line. *C & NW—7th Cir.*, 908 F.2d at 152; *C & NW—*

*8th Cir.*, 890 F.2d at 1025. In the Seventh Circuit decision, Judge Posner argued that sale of a line was also a management prerogative,

> akin to a manufacturer's decision to curtail its output or to retire unneeded capacity without replacing it. It is not a decision about labor inputs. It has of course consequences for the workers— any major business decision does. But if this were enough to make it a change in pay, work rules, or working conditions, then every significant business decision that a carrier made would be a mandatory subject of collective bargaining; there would be no management prerogatives; and *Pittsburgh & Lake Erie*, which holds that the carrier is not required to bargain over the sale of its business, would be incoherent.

*C & NW—7th Cir.*, 908 F.2d at 152. *See also Southern Pacific*, 752 F.Supp. at 408–09 (citing Judge Posner's opinion with approval). The Eighth Circuit extended *P & LE*'s holding by noting that "after the sale C & NW would have no relationship with the purchaser." *C & NW—8th Cir.*, 890 F.2d at 1025. *See also Railway Labor Executives Ass'n v. CSX Transp., Inc.*, No. 89–2639, Transcript at 64–66 (D.D.C. May 9, 1990 bench ruling) ("mere ownership and operation of rail lines is not a working condition preserved by the Railway Labor Act status quo"). These cases thus appear to hold that unions filing § 6 notices cannot, once a line sale is proposed, preserve their railroad jobs as part of the status quo while negotiations over proposed protections in the collective bargaining agreements are being completed.

If this is the holding of the Seventh and Eighth Circuits, it directly contradicts the Second Circuit's mandate in *Decker II*.[11] In this case, upon hearing of CSXT's intent

---

**10.** The Court also held that where a partial closing resulted in an unfair benefit reaped by an employer, the National Labor Relations Board could remedy that inequity by ordering "reinstatement of the discharged employees in the other parts of the business." *Id.* at 275, 85 S.Ct. at 1002.

**11.** The Fourth Circuit, noting that the Seventh and Eighth Circuits had extended *P & LE* to a

case involving a partial sale, expressly declined to make this same extension. The court stated: "[W]e need not address the more difficult question whether a railroad's status quo obligation during resolution of a major dispute prohibits it from divesting itself of lines." *Railway Labor Executives' Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 120 n. 4 (4th Cir.1990).

to sell the Buffalo–Eidenau line, the Unions filed § 6 notices to prevent the sale, and the attendant elimination of jobs, until bargaining over the effects of the sale on the Union could be completed. After an initial round of suits, *see supra*, CSXT filed suit in this court seeking a declaratory judgment that it had no obligation to bargain with the Unions prior to the line sale. The Unions counterclaimed, asking that the status quo be maintained until effects bargaining could be completed. The carrier defended this counterclaim on the ground that the dispute over the line sale was minor, i.e., it was covered by existing contracts. This court found this contractual defense not obviously insubstantial, and therefore permitted the line sale to go forward while the parties arbitrated their dispute. *Decker II*, 688 F.Supp. at 112, *aff'd*, 879 F.2d at 1002.

 Under the logic of *C & NW—7th Cir.* and *C & NW—8th Cir.*, however, CSXT would never have had reason to offer a contractual defense to the Union's claim. If "management prerogative" entitled CSXT to sell its rail lines and abolish the jobs on those lines, it would not have needed to argue that it had such rights under its contracts. Filing a § 6 notice would not, and *could not*, have forced CSXT to retain the Unions' positions on the Buffalo–Eidenau line, even in the absence of such a defense. *See C & NW—8th Cir.*, 890 F.2d at 1026. That is not what the Second Circuit held. In *Decker II*, the court explained:

> As stated earlier, the Board determined that there was "no written language support" in the Agreements, and no support in past practice, for CSX's position that it could sell the Buffalo–Eidenau line without bargaining over the effect of the sale on employees. Had the district court reached this conclusion at the outset, it would presumably have treated the controversy as a major dispute, *and CSX would have been required to maintain the status quo as to the affected employees*, whether or not any transfer of the Buffalo–Eidenau line occurred, pending resolution of that major dispute by the prescribed RLA procedures.

*Decker II*, 879 F.2d at 1003 n. 9 (emphasis added). In the absence of a plausible *contractual* justification for its actions, the carrier must maintain the status quo under § 6. *See Consolidated Rail*, 491 U.S. at 307, 109 S.Ct. at 2482–83; *General Comm. of Adjustment v. CSX R.R.*, 893 F.2d at 591; *Chicago & Northwestern Transp. Co. v. RLEA*, 855 F.2d at 1284–86; *Maine Cent. R.R.*, 787 F.2d at 782.

The principle that unions may preserve their positions under the status quo provision of § 6 is not new. *See Order of R.R. Telegraphers v. Chicago & Northwestern Ry.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). In *Telegraphers*, a carrier sought to eliminate a series of train stations—and the jobs at those stations—which, because of reduced traffic, it considered unnecessary for the efficient operation of its trains. The telegraphers union responded by filing § 6 notices, stating that it wanted to amend the collective bargaining agreement to add the following rule: "No position in existence on December 3, 1957, will be abolished or discontinued except by agreement between the carrier and the organization." *Id.* at 332, 80 S.Ct. at 763. The Court held that this proposal—to lock in the number of union positions in existence on a certain date—was a proper subject for collective bargaining.

> [I]n the collective bargaining world today, there is nothing strange about agreements that affect the permanency of employment. The District Court's finding that "[c]ollective bargaining as to the length or term of employment is commonplace," is not challenged.

> We cannot agree with the Court of Appeals that the union's effort to negotiate about the job security of its members "represents an attempt to usurp legitimate managerial prerogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations."

*Id.* at 336, 80 S.Ct. at 765 (quoting lower court holdings).[12] As a bargainable topic, the union's proposed contract change related to "rates of pay, rules, or working conditions," and was thus subject to the status quo provision of § 6. *Id.* at 334, 339–40, 80 S.Ct. at 763, 766–67; RLA § 6, 45 U.S.C. § 156.[13]

*Telegraphers* was distinguished in *P & LE*, but in a way that reaffirmed its significance for a case like the present one where a carrier eliminated only some of its railroad positions, not all of them.

In *Telegraphers* a railroad was seeking simply to eliminate or consolidate *some* of its little-used local stations. The railroad here, by contrast, sought to sell *all* its lines and go out of business. There is nothing in *Telegraphers* that forces us to reach the result, *in this extreme case*, that P & LE was prohibited from terminating its operations without first bargaining with the unions. Notwithstanding the policy considerations prompting the enlarged scope of mandatory bargaining under the RLA, in light of *Darlington*, which *First National Maintenance [Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981)] reaffirmed, we are not inclined to *extend*

*Telegraphers* to a case in which the railroad decides to retire from the railroad business.

*P & LE*, 491 U.S. at 508 n. 17, 109 S.Ct. at 2595 n. 17 (emphasis added). Thus, unions may still collectively bargain for job protection during a line sale and union members' positions are entitled to status quo protection during that bargaining.[14]

The court concludes that *P & LE* has not altered the Unions' statutory rights under § 6 as they might have applied to this case. Had CSXT not offered a plausible contractual defense to the Unions' § 6 request to bargain over new labor-protective provisions in its collective bargaining agreements, the Unions would have been entitled to preserve their positions as part of the status quo requirement of § 6 until the bargaining over new provisions was complete. *Decker II*, 879 F.2d at 1003 n. 9. The failure of this contractual defense before the Board entitles the Board to award a remedy to the affected union members in this case. *See Consolidated Rail*, 491 U.S. at 310 n. 8, 109 S.Ct. at 2483 n. 8; *Decker II*, 879 F.2d at 1005; *Chicago & Northwestern Transp. Co. v. RLEA*, 855 F.2d at 1288. This opinion should not be

---

**12.** The Court went on to note that:

The brief for the railroad associations there called our attention to testimony previously given to Congress that as early as 1936 railroads representing 85% of the mileage of the country had made collective bargaining agreements with their employees to provide a schedule of benefits for workers who might be displaced or adversely affected by coordinations or mergers. In an effort to prevent a disruption and stoppage of interstate commerce, the trend of legislation affecting railroads and railroad employees has been to broaden, not narrow, the scope of subjects about which workers and railroads may or must negotiate and bargain collectively. Furthermore, the whole idea of what is bargainable has been greatly affected by the practices and customs of the railroads and their employees themselves. It is too late now to argue that employees can have no collective voice to influence railroads to act in a way that will preserve the interests of the employees as well as the interests of the railroad and the public at large.

*Id.* at 337–38, 80 S.Ct. at 765 (footnote omitted).

**13.** It is important to recognize that RLA § 6, 45 U.S.C. § 156, uses parallel language for defining the topics that may be the subjects of collective

bargaining and the conditions that must be frozen as part of the status quo during bargaining over those topics. "[W]ritten notice of an intended change in agreements affecting *rates of pay, rules, or working conditions*" by a union or carrier leads *"[i]n every case"* to a requirement that, until negotiation and mediation is complete, *"rates of pay, rules, or working conditions* shall not be altered by the carrier...." *Id.* (emphasis added). *See also Consolidated Rail*, 491 U.S. at 302–03, 109 S.Ct. at 2480. Thus, if a subject is bargainable as a "rate of pay, rule, or working condition" under § 6, there is no indication in the statute that the same subject is not also governed by the parallel status quo language of § 6.

**14.** The purpose of preserving the status quo during § 6 bargaining is to balance the hardship between the carrier and the unions while effects bargaining takes place. By balancing the hardship—on the one hand, the carrier may not change working conditions, and on the other hand, the workers may not strike—the framework of § 6 induces the parties to bargain without interrupting vital rail traffic. *Shore Line*, 396 U.S. at 150, 90 S.Ct. at 299.

construed, however, to decide what remedy, if any, might be appropriate for these members. This decision is left in the hands of the Board. *See General Comm. of Adjustment v. CSX R.R.*, 893 F.2d at 592.[15]

The court hereby remands this case to the Board to consider whether to award a remedy to the union members affected by the sale of the Buffalo–Eidenau line in accordance with its earlier decision and this opinion.

## CONCLUSION

The Board did not exceed its jurisdiction in rendering its decision of December 15, 1988.

The Unions' motion to amend their answer in *CSXT*, CIV–88–1404C, is granted. Accordingly, as the claims brought by the Unions in *ATDA*, CIV–90–481C, have been merged into *CSXT*, CIV–88–1404C, the *ATDA* suit is hereby dismissed.

The court remands this case to the Board to consider whether to award a remedy to the union members affected by the sale of the Buffalo–Eidenau line in accordance with its decision of December 15, 1988, and this opinion.

So ordered.

---

**15.** In language relevant to the present facts, the Third Circuit noted:

> Our holding that this is a minor dispute and that the existing agreements between the parties, when considered in connection with established past practices, can conclusively resolve the dispute should not be taken to infer any judgment on our part on the merits of whether the Railroad has the authority to sell the York line without bargaining over its effects if Union jobs will in fact be lost as a result of the sale. The merits of that issue will be before the Adjustment Board *as will the question of what remedy may be appropriate if it decides for the Union.*

*Id.* (emphasis added).